## PETER BAUDUY v. ELEUTHERE IRENEE DU PONT, PETER SAMUEL DU PONT, MADAME BUREAU DE PUSY, and JACQUES BIDERMAN.

Court of Chancery.   New Castle.   March 16, 1816.

*Ridgely's Notebook I, 181.*

*McLane* for complainant.

### [*The Bill of Complaint.*]

The bill states that in the year 1801 a number of persons in France projected the establishment of a manufactory of gun powder in the United States and on April 21 of same year, an agreement was made, and Articles of Association were executed in Paris, by those whose names are subscribed thereto, which being translated into English are as follows:

*Articles of Association for the Establishment of a Factory of Gun Powder in the United States of America.*

The subscribers hereto, Du Pont de Nemours, Father and Son and Co. of New York; Biderman Catoire du Quesney and Co. and Eleuthere Irenee du Pont wishing to establish a powder factory in America do covenant and agree with each other, as follows:

Art. 1. The funds of the said establishment shall be $36,000 represented by eighteen shares of $2000 each.

Art. 2. The funds shall be paid as follows, by,
Biderman for 1 share
Catoire du Quesney and Co. for 1 share
Necker Germanie* for 1 share
Du Pont de Nemours, Father and Son and Co. for 11 shares
Peter Bauduy for 4 shares.

Art. 3. Each share shall entitle the holder to six per cent interest.

Art. 4. Irenee is to establish the said factory and to have the management and direction of it.   As a compensation he shall receive $1800 *per annum.*

---

* This name is spelled variously, "Necker Germanie," "Neckar Germanie," "Neckar Germany," and "Necker Germany," in the course of Ridgely's notes of this litigation.   The editor has adopted "Necker Germanie," which occurs in this transcript of the Articles of Association.

Art. 5. The buildings required for the said establishment shall be erected in the course of the present year, or in the first months of the succeeding year, that the factory may be in operation in the Summer of 1802.

Art. 6. An inventory shall be made every year of all the real and personal estate and property of the said establishment. The first inventory is to be made at the end of December, 1803. At the same time that each said inventory is made, a valuation of all the property shall also be made, and its actual value. Whenever said valuation exceeds the amount of the funds which were the first stock of the association, such surplus (after deduction therefrom for the interest payable on the shares) shall be considered as profit. The House of Du Pont de Nemours, Father and Son and Co. of New York being the principal shareholder shall appoint one of its firm, or constitute an attorney to be present at the said inventory.

Art. 7. The profits or losses (should there be any) shall be divided as follows: eighteen parts for the shareholders; nine for the director of the factory, as an interest in the establishment he will have made; and three for (blank) who was one of the projectors of the factory.

Art. 8. If it should not be necessary to dispose of the said three shares they shall be suppressed.

Art. 9. The director of the factory, and the agent of the house of Du Pont de Nemours, Father and Son and Co. shall fix and determine, each and every year, what proportion of the profits, should, in consequence of the inventory, be divided among the shareholders; and the division thereof shall be made.

Art. 10. The dividends and interest due to shareholders residing in France shall be paid to them in Paris by the correspondents of the House of Du Pont de Nemours, Father and Son and Co. of New York.

Art. 11. The director of the factory shall keep his accounts in the same manner as are kept in France the accounts of the Administration of Powder and Saltpetre.

Art. 12. In case of the death of the director, the House of Du Pont de Nemours, Father and Son and Co. is authorized to settle his accounts with the association, to appoint a successor, and to act in every contingency that may not have been foreseen by these articles.

Art. 13. This association shall end on January 1, 1810.

Art. 14. Each and every shareholder shall make known before January 1, 1809, whether he intends continuing the association, or withdrawing from it.

Art. 15. If two-thirds or more of those interested shall agree to renew the association, those of a different opinion shall be repaid their proportion in the first stock of the association, and in the profits that may have accrued agreeably to the inventory of December 31, 1809, in three installments of three, six, and nine months, with interest of six per cent on each said three payments.

Art. 16. If two-thirds of those interested in the said association should not agree to renew it, the final settlement of accounts shall be made by Citizen Irenee du Pont agreeably to the terms mentioned in the preceding article.

Art. 17. In the cases foreseen by the Articles 15 and 16, the inventory of the establishment on December 31, 1809, shall be made by persons named by the two parties; and in case of necessity the said persons shall choose an umpire.

Art. 18. The present Act of Association will serve as a title for each shareholder; a certified copy shall therefore be given to each of them.

Paris. 1st Floreal, 9. (21 April, 1801.)

That complainant is unacquainted with the names of the individuals of the firm of Catoire du Quesney and Co. and prays that defendants may discover and set these forth, but he believes that the persons composing the firm Du Pont de Nemours, Father and Son and Co. are (acquainted with their names, to be added, I suppose). That, in pursuance of this agreement, said E. I. du Pont named superintendent came from France to the State of Delaware to establish said manufactory in the year 1802, but $26,000 only having been subscribed in France, $10,000 were to be supplied by further subscriptions in the United States. That E. I. du Pont became desirous of establishing the manufactory upon the Brandywine. That complainant then resided at Wilmington whither he had retired with the remnant of his fortune from St. Domingo, and where he was in a fair way of repairing his losses. He possessed credit and commercial connections in the United States, and these, as also being a native of France, and being a personal acquaintance of Victor du Pont, the brother of E. I. du Pont, recommended him as a suitable member of the association. That E. I. du Pont proposed his becoming a partner, and he subscribed the said concern for two shares, amounting to $4,000, in consideration of an agreement embracing the terms of the said

propositions, entered into August 25, 1802, which being translated, is as follows:

*Articles of Agreement between the House of Du Pont de Nemours, Father and Son of New York,* acting in conformity with the Art. 12, of an Act of Association made at Paris April 21, 1801, for the establishment of a powder manufactory in America, *Eleuthere Irenee du Pont, director of the said manufactory, of one part and Peter Bauduy of Wilmington of the other.*

Art. 1. Peter Bauduy binds himself after the signature of the present Articles to assist by all his means, and the knowledge he has of the country, the buildings and establishment of the manufactory now begun on the Brandywine.

Art. 2. Peter Bauduy also binds himself to give his time and all attention from the 1st May till 1st of December of each year to all the care that the said manufactory may be in want, for the purchase of raw materials as well as the sale of powder, and for the establishment of the divers agencies in the interior, as well as the different journeys to be made to settle with those agencies and purchasers.

Art. 3. Peter Bauduy will furnish his indorsement and his credit at the Bank of Wilmington for the divers sums of money that the factory may be in want of, in case that the payments due to the said factory should not meet the expenses and purchases that may be wanted, it being well understood that those sums will be secured to him by the said manufactory, his signature binding him personally for those sums.

Art. 4. In indemnity of this care and trouble given by Peter Bauduy, as well as for the credit that he procures to the establishment, the three shares of profits left by the Article 7 of the Act of Partnership will be allotted to him with a commission of 2½ per cent on the proceeds of sale of the powder manufactured by the said manufactory.

Art. 5. The travelling expenses in the interior of the country which would be wanted by the said manufactory will be paid Peter Bauduy extra.

Art. 6. The advantages and profits allowed to Peter Bauduy will be continued as long as he will render the services specified in the Articles 1, 2, and 3 of the present agreement.

Executed at Wilmington, 25th of August, 1802.

By power of attorney from Du Pont de Nemours Father and Son, now in Paris,

(Signed)    *Victor du Pont and Co.*                    (Seal)
            *Eleuthere Irenee du Pont de Nemours.*    (Seal)
            *Peter Bauduy.*                          (Seal)

That Archibald McCall of Philadelphia and William Hammond of Delaware were also prevailed on to enter into said partnership, and subscribed for one share each, amounting together to $4,000, but afterwards relinquished the same as hereinafter is stated.

That the remaining one share has never been subscribed, but Eleuthere Irenee du Pont has reaped the profits of it; and the business has been conducted by the credit of complainant which he never ceased to yield, until the execution of the agreement hereinafter mentioned in Philadelphia, when necessary to the due discharge of his duty.

That E. I. du Pont, immediately after the subscriptions, proceeded to establish said manufactory on the Brandywine, upon a seat purchased by said E. I. du Pont and called the Eleutherean Powder Works.

That it was soon discovered from the manner of proceeding, not possible to get the factory into operation in 1802, as was expected and stipulated, and that said E. I. du Pont, instead of investing the funds economically in necessary works lavished more than one-quarter of funds in unnecessary expenses, in travelling, in salaries from the date of the agreement executed in Paris, and in extravagant buildings for his own comfort and accommodation on the Brandywine. Thus funds wasted, larger capital necessary.

That at this crisis McCall and Hammond withdrew from the concern, unwilling longer to continue an advance and risk of their capital, and complainant was compelled to sacrifice the sum already advanced or to make an effort to supply the deficiency by McCall and Hammond withdrawing; and he chose to embrace latter alternative and became owner of the two shares relinquished by them.

That complainant, being more deeply interested than he had contemplated, both as to his credit and exertions; and discovering that he would be obliged to exceed in a greater degree his share and credit under the letter and spirit of the original association, that he would be placed in a like proportion at the mercy of the accidents peculiarly incident to powder manufactories, whilst the partners in Europe were to reap all the benefits of an establishment met upon a much larger scale independent of

their exertions, he remonstrated against the course pursued by the superintendent, and the unreasonableness of requiring him to preserve his responsibility without a proper indemnity; he proposed to receive as an equivalent the profits of the share not subscribed, [which was] refused. Still uneasy. Dispute referred to Victor du Pont of the House de Nemours, Father and Son and Co. at New York, who proposed the following arrangement which was agreed to and executed by complainant and E. I, du Pont and said Victor du Pont on behalf of Samuel Peter du Pont at New York, July 1, 1805:

> *Articles of Agreement between Messrs. Du Pont de Nemours, Father and Son and Co.,* acting in conformity to the Art. 12 of the Act of Association made in Paris April 21, 1801, for the establishment of a manufactory of powder in America, *Eleuthere Irenée du Pont, director of the said manufactory, and Peter Bauduy, a partner in the manufactory.*

> Having found that during the time, and since the beginning of the establishment, several circumstances occurred which had not been foreseen by the former acts and which require further agreement, it has been agreed as follows:

> Art. 1. The funds necessary to the establishment and carrying on of the manufactory having exceeded the sum which had been agreed by the Act of April 21, 1801, in consequence of this circumstance the parties interested having furnished credits and guarantees which had not been foreseen at the date of their agreement, it will be granted to Peter Bauduy a compensation of $1,000 to be paid previous to any share of profit divided.

> Art. 2. Since the manufactory is in operation, several contracts having been made which could not have been foreseen at the date of the agreement executed in Wilmington the 25th August, 1802, it is agreed to compensate Peter Bauduy on those works an indemnity equivalent to the 2½ per cent which has been allowed to him on all the sales; it will be granted to him on all the powder re-manufactured, and other works in which it does not enter a purchase of materials 5 per cent on the price received for those works.

> Art. 3. It is further agreed between the parties that the agreement executed in consequence, and since the first Act of Partnership executed in Paris April 21, between the first partners, they have not understood to deviate from the articles of this instrument, and although it has been neces-

sary to secure to Peter Bauduy, according to the law and custom of this country the share which belongs to him, and that it has been necessary to execute him a deed of sale, Peter Bauduy nevertheless considers himself bound, as well as the other partners to the conditions of the first Act, particularly to the Articles 15 and 16 which regulate the mode of liquidation of the partnership; Eleuthere Irenee du Pont in his guarantee to Peter Bauduy, that if at the time of liquidation of the partnership, or at its renewal, he will enjoy, in all cases, the right to keep the same interest and advantages prescribed by the Act of the 25th of August, 1802.

Art. 4. By the loss in the Art. 7 of the Act of April 21, 1801, which, as well as the profits, are to be divided according to the said Act in thirty shares, it has been understood that it is the loss in trade and bad success of the factory but not those which could be sustained by the destruction of the work, by accidents which reasonably ought to be supported by the owners of the property.

Executed in New York, 1st of July, 1805.

By power of attorney of Du Pont de Nemours, Father and Son, now established in France,

> *V. du Pont de Nemours and Co.*
> *E. I. du Pont de Nemours.*
> *Peter Bauduy*

In presence of:

> *R. Duplanty*
> *P. du Pont*

Complainant submitted to this arrangement because of the great portion of funds and credit he had involved, risk etc. (See this reason denied, below.) After the execution of this agreement, usual mismanagement and extravagance by E. I. du Pont. Accounts not settled. Valuation not made until 1809. Private accounts of superintendent mingled and kept with the concern, as to make it difficult so as to discriminate, or ascertain state of the business. Time of association to expire [——] [1] 1809; accounts closed, and valuation made to be remitted to Europe. E. I. du Pont proposed to renew concern for [——] [2] years, and transmitted to the partners in France similar propositions.

The business had been established on a larger scale than was at first contemplated. A great proportion of the profits had been invested in real estate and permanent improvements which

---

[1] Blank in manuscript.

[2] Blank in manuscript.

were valued at a low rate, and if concern closed at that time would have been sacrificed. To avoid this, and risk and difficulties etc. etc., notwithstanding mismanagement, complainant agreed to renew the concern for [——] [3] years, and on December 31, 1809, executed following agreement:

*Renewal of partnership December 31, 1809.*

The undersigned owners and director of the manufactory of gun powder on the Brandywine, in virtue of the above Act of Association, and in conformity to the Art. 15 of the said Act, have renewed for the space of nine years from this date the association contracted between us, and which term expired this day; understanding to extend the above mentioned association in conformity to the cases stipulated and agreed by the primitive Act dated April 1, 1801, and those subsequent, dated August 25, 1802, and July 1, 1805, without alteration till January 1, 1819, the term exclusively for the prolongation of the association, which will then be renewed or liquidated in conformity to the articles and conditions fixed by the 14, 15, 16, and 17 Articles of the primitive Act.

In witness whereof we have signed the present by quadruplicates.

Wilmington, December 31st, 1809.

> *E. I. du Pont*
> *P. Bauduy*

In presence of:

> *R. Duplanty*
> *Charles Dalmas*

That complainant as usual devoted his time and labor and credit in pursuance with his engagements. But same improper management, unnecessary buildings erected, workmen improperly employed. Advice of complainant slighted. Books kept irregularly, unintelligible to one not skilled in secret mode of keeper. No settlement nor valuation of stock and property. Political events rendered the business more profitable than was expected and complainant was at liberty to draw from the money of concern his supposed share of profits, a practice of E. I. du Pont. Complainant obliged to do this or forego his profits for want of a settlement.

Charges that he drew no more than he would have been entitled to on fair settlement and due management of the business. That in Spring of 1813, war improved the powder business and sales. Additional powder mills to be built; several weeks em-

---

[3] Blank in manuscript.

ployed in so doing. Before said mill finished, to wit, in March 1813, E. I. du Pont contracted with the United States to furnish 500,000 lbs. powder in October, 1814. Profits to be $5,000 a month. New mills necessary. Property at Hagley on the Brandywine bought for $37,000. Old works not converted into powder manufactory but E. I. du Pont began a new establishment and could not begin to make powder until April, 1814. Brother-in-law of E. I. du Pont moved to new establishment at a liberal salary, and house erected for him, though a single man, at expense of $[——].[4] Complainant became object of hostility. Situation unpleasant, proposed to separate, and retired at a great sacrifice. (See below, these reasons denied in answer). Since the execution of original Articles, changes in the parties. Has been informed that in place of original parties at Paris, the shares are held by said E. I. du Pont, Peter Samuel du Pont, Madame Bureau de Pusy and Jacques Biderman, but in what proportions knows not. On February 15, 1815, complainant withdrew on following agreement made at Philadelphia:

*Memorandum of an agreement made February 15, 1815 between Peter Bauduy of Wilmington in the State of Delaware of first part, Eleuthere Irenée du Pont, Peter Samuel du Pont by his attorney the said E. I. du Pont, Madame Bureau de Pusy by her attorney Augustin Bousquet, and Jacques Biderman by his attorneys the said Augustin Bousquet and Jacques Antoine Biderman, of the second part.*

Whereas the said parties have hitherto been concerned in partnership, as proprietors of certain gun powder manufactories established on the Brandywine, at the Eleutherian Mills and at Hagley, and the said parties of the second part have agreed with the said party of the first part to buy him out, in order hereafter to carry on the business on their own account. Now this agreement witnesseth as follows, that is to say,

*First.* The said Peter Bauduy, hereby sells and assigns to the said parties of the second part, all his shares, actions, interest and concern whatsoever in said manufactories, including both his four shares of capital or stock, and his three shares of profits, it being understood that the said Peter renounces forever from the 1st day of January, in the present year 1815, the commissions granted to him, by an article dated August 25, 1802, and another article dated July 1, 1805, between the said parties; and that he also renounces all profits accrued or arising on his four capital

---

4 Blank in manuscript.

stock shares, and his three profit shares, from January 1, 1810, absolutely and forever.

*Second.* The parties of the second part will hereafter arrange among themselves the terms on which the shares of the said Peter Bauduy shall be distributed among them; it being now understood that the said four shares of stock of said Peter Bauduy shall go to the said E. I. du Pont, and the said shares of profit to all the parties of the second part.

*Third.* As a consideration for said sale, the said parties of the second part agree to allow to said Peter Bauduy the sum of $60,000 in addition to his commission of $2\frac{1}{2}$ per cent on sales, which is to be credited to him up to January 1, 1815, or, in other words, the said commission up to said date is to be credited to said Peter's account with said concern, and then the sum of $60,000 is also to be credited to him for the above sale of his shares of capital, shares of profits, and arrears of profits. If after thus crediting the said Peter's account, there shall be a balance due by him to the concern the same shall be paid by him; if, on the contrary, there shall be due a balance to him by the concern, the same shall be paid to him; and the said payments, whether to or by him shall be made in [——] [5] months from the time the said Peter's account with the concern is settled.

*Fourth.* In addition to the said compensation, the said parties of second part agree to pay to said Peter Bauduy $15,000 yearly, for four years, the first payment to be made on January 1, 1816, and the last on January 1, 1819, but said payments to cease in case said manufactories or either of them be burned, or destroyed by the enemy in the course of the four years above mentioned.

*Fifth.* Upon the execution of these presents the said Peter Bauduy will convey, transfer and surrender up to the parties of the second part the title he possesses to the real estate of the concern, and will from the day of the date hereof cease to use the signature of the said partnership, or to claim any right, interest, or control in the said manufactories, or in the profits thereof. He will at the same time give up and deliver to said parties all books, papers, vouchers, and documents relating to the said concern,

---

[5] Blank in manuscript.

In witness whereof, the said parties have hereunto inter-changeably set their hands and seals the day and year first above written.

| | |
|---|---|
| Pierre Sam, du Pont by his attorney, | (seal) |
| *E. I. du Pont* | (seal) |
| B. de Pusy by her attorney, | (seal) |
| *Augustin Bousquet.* | (seal) |
| Jacques Biderman by his attorney. | (seal) |
| *Augustin Bousquet.* | (seal) |
| *J. Aug. Biderman.* | (seal) |
| *Peter Bauduy.* | (seal) |
| *E. I. du Pont.* | (seal) |

Sealed and delivered in the presence of us.
*Hor. Binney*
*John C. McCall*

That complainant performed his part of said agreement. That the sum of $60,000 would render the balance of [——] [6] greatly in his favor, which was the vital principle of the compromise which led to said agreement, and was so understood in all con-versations with the parties preparatory to the execution of said agreement. No accounts were exhibited until late in the Fall of 1815, when a set of accounts were exhibited making a balance against complainant of $5396.19 incorrect and illegal. Defend-ants have refused to pay to complainant the $15,00[0] to be paid January 1, 1816.

That even on the principles of the agreement made in Phila-delphia, with the allowance of the said $60,000, if accounts were settled fairly there would be due to complainant more than [——].[7]

No true accounts have been rendered but the accounts stated are erroneous in the following particulars:

1. That E. I. du Pont's own private accounts with com-plainant is included; improper in the partnership accounts; and more than balanced by complainant's accounts against him, and erroneous especially in one instance by the charge of $2,000 for a mill seat twice charged.

2. Complainant entitled to a commission, 2½ per cent on powder manufactured and sold, whereas he is credited only with 2½ [per cent] on net proceeds of sales after deducting costs and charges for transportation, agents etc., making

---

6 Blank in manuscript.

7 Blank in manuscript.

a difference against complainant of more than [——] [8] as will appear by account *A*.

3. On two contracts made with the United States for powder, the price and sale amounted to [——] [9]. Complainant is allowed 2½ per cent only on the price of the re-manufacture thereof, estimated at $[——] [10] whereas he should have been credited with 2½ per cent on the sales thereof to the United States, which, if so done, would make a difference of [——] [11] in favor of complainant.

4. In said accounts, complainant is charged with the sum of $[——] [12] as one full moiety of extra and usurious interest paid by said superintendant, over and above the legal interest for money borrowed by him since 1810; not allowable against complainant since said E. I. du Pont had no authority to pay more than legal interest and as complainant has renounced his share of profits after 1810, he cannot be answerable for interest paid subsequent to that time.

5. That in said accounts complainant is charged with powder sold by him to one G. D. Read on account of said concern, which complainant has long since settled with concern.

6. No settlement being made by E. I. du Pont, according to the understanding, complainant drew for his proportion of profits on Garesche[13] and Raviseer,[14] agent for said concern in Philadelphia; upon all which sums of money so drawn complainant is charged in said account with interest, though the said Garesche and Raviseer never charged said concern with interest, and therefore not chargeable to complainant.

7. That said concern has omitted to credit complainant with money advanced and articles furnished, amounting to

[8] Blank in manuscript.

[9] Blank in manuscript.

[10] Blank in manuscript.

[11] Blank in manuscript.

[12] Blank in manuscript.

[13] This name is spelled variously, "Garesche," "Garresche," "Gareshe," "Garreshe," "Gareshee," and "Gareschee," in the course of Ridgely's notes of this litigation. The editor has adopted "Garesche."

[14] This name is spelled variously, "Raviseer," "Ravisier," "Ravieset," "Ravesies," and "Ravessies," in the course of Ridgely's notes of this litigation. The editor has adopted "Raviseer."

more than [————],[15] as will appear by account annexed, marked *B*.

Complainant charges great extravagance, and that profits [were] made by particular course of the times, and the nature of the business, and that much larger profits would have been made if the business had been properly conducted, etc. That complainant did not draw more than his proportion of profits.

Prayer for discovery etc. of all the business done on behalf of the concern from the date of the contract at Paris to the present time, comprehending the contracts made with the United States as well as with others. Also an account of the profits made from the date of the agreement (at Paris) to the time of filing their respective answers. Also an account of the powder made and sold and the prices at which it did sell; whether sold by defendants, or by others on account of the concern. Also that defendants may produce the books, and other entries and vouchers of the concern from the date of the original establishment to the date of their respective answers, with the name of the keeper thereof. Also set forth the manner in which the profits have been disposed of. And the defendants may come to a fair account and settlement with complainant and to rectify the many errors existing in the accounts rendered as aforesaid and specifically execute and perform the Agreement dated at Philadelphia aforesaid (February 15, 1815, p. 8.) according to the true intent and meaning thereof, and to pay to complainant the balance which may be found due to him. And for other and further relief.

---

[15] Blank in manuscript.

[*Accounts Annexed.*]

*A*

Powder sold according to Mr. E. I. du Pont's book.

| | |
|---|---|
| In 1810 | $ 86614.27 |
| 1811 | 122006.25 |
| 1812 | 148007.95 |
| 1813 | 216392.39 |
| 1814 | 292851.85 |
| | 865872.71 |
| | 619067.93 |
| | $246804.78 |

*B*

Powder sold according to Messrs. Du Pont and to accounts.

| | | |
|---|---|---|
| In 1810 | | $ 43455.94 |
| 1811 | | 127866.64 |
| 1812 | | 112962.73 |
| 1813 | | 165780.67 |
| 1814 | 30th June | 39686.22 |
| | 31st December | 129315.73 |
| | | $619067.93 |

The difference *per* the above statement is $246,804.78; 2½ [per cent] commission on the above is $6,170.11.

The restrictions on my commissions having taken place from 1810 to 1814, a space of four years.

| | |
|---|---|
| I take the mean time, thirty months, and charge on the sum of | $6,170.11 |
| Thirty months, simple interest 6 per cent. | 925.51 |
| Charged to D. de N. and Co. in account current | $7,095.62 |

## C

Delivery of powder according to E. I. du Pont's book.

| In | 1804 | $15116.75 |
|----|------|-----------|
|    | 1805 | 46857.75 |
|    | 1806 | 45146.40 |
|    | 1807 | 47694.45 |
|    | 1809 | 53863.42 |
|    | 1809 | 71183.99 |

$279862.76

243554.79    (Amount on which my commission is calculated according.)

difference  $36308.97

2½    [per cent] commissions

907.72    (Those restrictions having taken place from 1804 to 1809, I charge 2 years interest on $907.72.)

108.90

1809  $1016.62

60.99 interest

1810  $1077.61

64.65

1811  $1142.26

68.53 interest

1812  $1210.79

72.64

1813  $1283.43

77.00 interest

1814  $1360.43 (Amount carried to account current.)

*[Answer of E. I. du Pont.]*

The several pleas of E. I. du Pont, one of the defendants, to part, and the several answers of the said E. I. du Pont to the other part of the bill of complaint of Peter Bauduy, complainant.

This defendant by protestation not confessing nor acknowledging all or any of the matters and things in the complainant's said bill of complaint contained to be true in such manner and form as the same are therein declared and set forth. As to such part of the complainant's bill as prays an account of and concerning any matters and things done or transacted between the said complainant and the defendant in his said bill of complaint at any time before, and unto the 24th day of February, 1806, as to all such other part of the said bill, as is not hereinafter pleaded or answered unto, this defendant for plea saith, that upon the said February 24, 1806, the said complainant and the said defendants did make up, state and settle an account in writing of all matters things and transactions touching or concerning, or in any wise relating or appertaining to the premises charged in the bill prior to that date, and of all sales and purchases, commissions, profit and loss, and sums of money, estates, goods, wares and merchandise belonging or appertaining to the firm or copartnership between the said complainant and the said defendants. Which said account stated and settled as aforesaid, this defendant avers to be just and true to the best of his knowledge and belief.

And this defendant also avers that the said account stated was fairly, truly and correctly settled and adjusted without any fraud, omission or mistake, to the best of this defendants' knowledge and belief, as by a true copy of the said account stated, contained in the schedule marked *No. 1,* hereunto annexed, and which this defendant prays may be taken as part of his plea, reference thereunto being had, will more fully and at large appear; the original whereof is in the possession or power of this defendant ready to be produced as this honorable court shall direct. All which matters and things this defendant doth aver, and is ready to prove as this honorable court shall direct. And this defendant doth plead the said accounts settled and stated in bar to such part of the said bill of complaint as demands an account from the said defendants for any matters or things in the said bill mentioned, on or before February 24, 1806, and humbly demands the judgment of this honorable court whether he shall make any other or further answer thereunto.

And as to such parts of the complainant's bill as prays an account of and concerning etc. from the day and year aforesaid

(February 24, 1806) at any time before and unto December 31, 1809, this defendant pleads an account stated and settled on or about December 31, 1809, from February 24, 1806 to December 31, 1809, copy whereof is contained in schedule *No. 2*. So defendant pleads as to any matters etc. from December 31, 1809 to December 31, 1810, an account stated etc. to December 31, 1810, copy whereof is annexed *No. 3*. So defendant pleads an account stated etc. from December 31, 1810 to December 31, 1813, on the day last aforesaid, as by copy *No. 4*. Lastly, the defendant pleads an account stated etc. in October 1814, from December 31, 1813 to June 30, 1814, as by copy annexed *No. 5*.

As to so much of the bill not before pleaded unto, the said defendant answers, defendant admits that in 1801 a number of individuals in France formed a plan of establishing a manufactory of gun powder in the United States of America, that Articles of Association or Agreement were made at Paris April 21, 1801, a translation whereof is annexed in Schedule *A*. The original subscribers to the said Articles of Agreement were:

Jacques Biderman, for 1 share.

The firm of Catoire du Quesney and Co. (with the individuals composing which this defendant is not acquainted, nor does he know who they are), for 1 share.

Du Pont de Nemours, Father and Son and Co., 12 shares.

And in July 1801, after this defendant had sailed for the United States, Necker Germanie signed the duplicate of the Articles of Association left in France, for 1 share.

In August 1802 the complainant subscribed for 2 shares.

As did A. McCall in manner hereinafter stated.

And William Hammond also agreed to take a share, and actually paid part of the money, but he never signed the Articles, and the sum advanced was afterwards reimbursed to him.

By the subscription of four shares of stock in the United States the number of shares originally held by Du Pont de Nemours, Father and Son and Co. were reduced from twelve to eleven. But in November, 1807, they purchased the share of Catoire du Quesney and Co. and in March, 1808, this defendant purchased the share of Necker Germanie as the complainant had previously purchased the share of A. McCall in the manner hereinafter stated.

Defendant came into Delaware, 1802. Complainant subscribed for two shares. Complainant [was] recommended, by his residence at Wilmington near Brandywine, by his acquaintance with

the people, country and language, and the credit he represented himself to possess. Complainant's principal inducement [was] to repair his fortune, in which he has succeeded beyond his most sanguine expectation. Schedule B contains a true translation of original Articles of Agreement between complainant and defendants. Original in possession of defendant, dated August 25, 1802. Admits that A. McCall and William Hammond became interested in the concern, but denies that they relinquished their interest, in the manner and for the reason stated in the bill. Denies that there was one share of stock remaining unsubscribed, as alleged in the bill; that share belonged to Necker Germanie, who received the profits until 1808, when defendant, said Necker Germanie having died, purchased it of his heirs, previous to which purchase defendant received no profits on said share. Admits that soon after execution of act last mentioned (with Bauduy, August 25, 1802) defendant proceeded to erect the buildings on the Brandywine. Time and labor required; could not be completed within time originally contemplated. Denies that funds were wasted. Defendant was compelled to make a voyage to Europe to procure machinery, but this was before the complainant had any concern in the business.

Archibald McCall purchased two shares, which he sold to complainant. William Hammond agreed to take one, but after paying part of the purchase money, he disposed of his interest as before stated. Denies that they parted with them for the causes alleged in the bill, and he believes they parted with them in consequence of suggestions of plaintiff. Defendant says that notwithstanding the very advantageous terms granted to complainant on his subscription of two shares, and purchase of two shares from McCall, which entitled him to interest on $8,000, besides the regular profits, on said four shares; and the profits on three share of profit, given to complainant by agreement executed August 25, 1802, together with 2½ per cent on the proceeds of the sales of gun powder manufactured and sold by defendants, the complainant became dissatisfied, solicitous for greater allowances.

Defendant resisted the importunities of complainant, but at length he submitted the subject to Victor du Pont, whereon a further agreement was executed between complainant and defendant July 1, 1805, a true translated copy of which is marked C hereunto annexed. By the agreement last mentioned defendant obtained the additional compensation of $1,000, to be paid previously to a division of profits. Defendant denies that complainant submitted to said agreement by considerations stated in his bill (see above).

Defendant denies mismanagement and extravagance, before or after execution of last agreement. Defendant denies the charges that the accounts of the concern were not settled, nor valuation of the property, according to the original Articles of Association. On the contrary, he says that the accounts between complainant and defendant were repeatedly settled, as before pleaded, without any fraud, omission, or mistake, as charged in the bill. The accounts of concern were principally kept by complainant himself from the time he became interested in the establishment until some time in the Summer of 1808 and at no time by defendant who admits his private accounts were kept in the books of the company, as his private business was very limited and did not require separate books. Complainant had daily access to the books. It is manifest that in keeping private accounts of defendant in said books, he had no wish to conceal his private transactions from complainant, and, if any error, he would soon have perceived it and pointed it out, which was not done, nor was it pretended that any such error had occurred in private account of defendant. But if books were irregular, fault of complainant who had taken on himself the task, and whose duty it was to keep the accounts correctly. That after period last mentioned (Summer of 1808), regular bookkeeper employed with consent of complainant; but complainant continued to make entries, to inspect, superintend, and correct them, until his connection in the business ceased.

Defendant denies that the business was carried on more extensively than to keep pace with demand for the gun powder, which was of superior quality. Defendant denies that from 1809 the property and estates of the company were valued at a very low rate, but they were valued at a reasonable price, as by Schedule *D*. Complainant saw and examined the appraised value of the same, before it was entered in the books, and never objected to it. And valuations were made in 1806 and 1814 respectively. Credit of establishment not to be attributed to complainant, but to excellent quality of the gun powder, manufactured under the care etc. of defendant. That if complainant's charges of inattention etc. were well founded it is singular that complainant should renew and continue the partnership, a number of years after the time limited for the original partnership had expired. Yet an agreement was executed December 31, 1809 to extend the partnership for the term of nine years from that date, as by copy translated, marked *E*, will appear.

Defendant denies that complainant contributed all the aid to the concerns of the company stipulated by him. Defendant denies any mismanagement on his part, before or subsequent to the

renewal of partnership. He denies that the accounts subsequent were kept so as to be intelligible to no person unskilled in the secret mode of the keeper etc. He denies that the advice of the complainant was neglected. Defendant says if settlement of the books were not made as frequently as complainant wished the omission is to be imputed to complainant; he responsible, his province. Defendant denies that there was any understanding that complainant should [draw] out of the funds of the company to his own use, his supposed share of profits; he drew at his own will from the banks and agents of the company using the signature of the company, and frequently without taking notice thereof in the books of the company, or apprising them of it in any other way.

Defendant admits that the business became very brisk by the war with England, and defendant's anxiety to supply the increasing demand for gun powder. He pushed the works night and day; danger great from the accumulation of large quantity of powder. Good policy to establish another factory, distant from former. Quantity of powder increased, profits enlarged, risk diminished. Works at Hagley not sufficient to supply the demand and comply with contract with the United States. Works at Hagley required an experienced superintendent, defendant's brother-in-law, Mr. Delmar was sent there to attend the factory, and he was obliged to build a frame house (to which complainant did not object till frame was put up), in consequence of the dwelling-house at Hagley being occupied by Mr. Garesche, son-in-law of complainant, who had no concern with the powder business. Defendant avers that before he commenced said frame house, he consulted complainant who approved of it, with the view of accommodating his son-in-law with the dwelling-house at Hagley. Defendant denies the conduct charged in the bill etc., has frequently submitted to complaints of complainant made without cause, who pretended to be dissatisfied, though he was receiving immense profits for the capital actually advanced, as appears by Schedule *F* hereunto annexed.

Defendant admits that February 15, 1815, an agreement was made by complainant and defendant a true copy of which is annexed in Schedule *G*, by which agreement complainant left the firm according to the terms therein mentioned. Defendant denies that it was for the reasons mentioned in the bill (see above). By this agreement complainant has relinquished his claim on defendants for any profits which accrued on his four shares of stock or three shares of profits prior to January 1, 1810, and as to any profits subsequent to that time, he has agreed to accept,

in lieu thereof $60,000, in full satisfaction for the same, as by the said articles will appear. And defendant prays the benefit of said matters in as full and ample manner, as if the same had been in due form pleaded; and insists that for this cause he cannot be called on to account for any other profits.

And defendant further says that inasmuch as by the account settled and stated in October 1814, contained in Schedule No. *V,* as herein before pleaded, there was a balance due from complainant to defendant of $56,000 and upwards, it was reasonably to have been expected, and ought to have been anticipated, that upon closing the accounts of the firm, according to the agreement for that purpose there would have been a large balance in favor of defendants, as in fact there was, though the complainant had actually made on his capital of $8,000 more than $13,000 annually for the last five years, which he had drawn out of the funds of the said company.

Defendant says that delay in making out and completing the accounts according to the last agreement arose from complainant's having possession of the book in which his account current with the firm was kept, which he never returned till middle of Summer, 1815. And defendant says that, about September 20, 1815, said accounts were furnished as contained in true copies of the same marked *H, I, J,* which are true etc. Defendant denies the errors alleged against the accounts last mentioned, and says that his private account charged is justly due, and ought to be deducted from claim of complainant who defendant verily believes has no charges on his private account against defendant which have not been paid or settled. No double charge of $1000 as will appear by reference to Schedule *K.*

Defendant denies that complainant was entitled to receive 2½ per cent on the sales of powder manufactured and sold but was only entitled to 2½ per cent on the proceeds of such sales, which have been allowed him, and therefore in this respect no error. And defendant says that complainant, well knowing and understanding the meaning of their agreement, never alleged that he had any right to such commissions on the sales of powder as are now alleged in the bill. (Complainant claimed 2½ per cent on the gross sales etc.; defendant here alleges that he is entitled only to 2½ per cent on *net proceeds,* see above, item 2.) Nor did he ever set up a claim to more than 2½ per cent on the proceeds of such sales, conformably to the original article, in the French language and the true translation thereof herein before mentioned, though the complainant actually made the entries in the books of the firm as herein before stated. True account kept

and rendered complainant of all powder manufactured and sold, and of the proceeds of such sales in pursuance of the agreement made when complainant relinquished his interest in the concern.

Defendant denies that complainant is entitled to the commissions claimed by him on 500,000 lbs. of gun powder manufactured for the United States, who found the materials, but he was only entitled to 5 per cent on the price defendants received for manufacturing.

Defendant says complainant is justly chargeable with his proportion of extraordinary interest paid by the firm for the loan of money in consequence of the large sums which the complainant had, equally with this defendant, drawn out the funds of the concern; because interest was paid with approbation and consent of complainant who participated in procuring said loans. And though complainant has been allowed $60,000 for his share of profits, since 1810, he is nevertheless subject to his proportion of the expenses and losses sustained, in the same manner as if he had received the regular profits which were less.

Defendant says that complainant is properly charged with the sum, principal, and interest for powder sold by him to a certain G. D. Read, on account of concern which complainant never has settled with, or paid to defendants.

Complainant properly charged with interest on money drawn by him out of the funds; for he has been allowed interest on all sums passed to his credit. This the practice of the firm. Defendant knows of no sum paid by complainant for the firm nor of any articles purchased by him for their use which they have omitted to credit him, to sum of $1,000, or any other sum, and therefore he does not admit said charges. Complainant never objected to the accounts stated, previous to the dissolution of partnership. Defendant ready to correct errors, offered to refer to arbitrators, agreed to pay provisionally. No errors in the account. Complainant owes a balance of $9,058.[0]7 to defendants, exclusive of interest.

---

### Schedule No. 1.

This schedule purports to be an account between the parties, beginning August 24, 1802, and ending February 11, 1806, though interest is calculated to February 24, 1806. It is thus headed, "Dr. Messrs. E. I. du Pont de Nemours and Co. in account current and interest up to February 24, 1806, with Peter Bauduy." The balance there stated in favor of P. Bauduy is . . . . $11,260.33.

That schedule has this indorsement,—"1802 to February 24th 1806. E. I. du Pont and Co. in account with Peter Bauduy copied from P. Bauduy's Book." This account was drawn up in February 1806 by R. Duplanty; the particulars of it having been furnished to him by Mr. Bauduy who examined the said account and found it correct, corresponding entries were consequently made in the books, probably by Mr. Bauduy himself.

### Schedule No. 2.

Purports to be an account between the parties beginning February 24, 1806, and ending December 31, 1809. The balance there stated in favor of E. I. du Pont and Co. is $5,792.62. This account is headed as the other and indorsed to be drawn up by R. Duplanty, December 1809, and in beginning of 1810. Mr. Bauduy furnished the particulars etc.

### Schedule No. 3.

Purports to be an account between the parties making E. I. du Pont de Nemours and Co. debtors. It begins January 1810, ends December 31, same year. Balance in favor of Du Pont and Co. $87.77. This account is thus underwritten, "The original hereof is to be found in Mr. Bauduy's account current book written partly by himself. It is as drawn by Mr. Duplanty, examined by Mr. Bauduy." To this schedule is annexed a statement of gun powder sold by E. I. du Pont de Nemours and Co. and their agents, in the course of the year 1810:

| | | | |
|---|---|---|---|
| By themselves | Kegs | 941 | $13,489.11 |
| By their agents | | 4078 | 59,176.02 |
| | | 5019 | $72,665.13 |
| | Receivable in 1811 | | 34,584.19 |
| | | | $38,080.94 |

$952.02, Peter Bauduy's commission at 2½ per cent. Gun powder manufactured with the Saltpetre of the United States at $10.75,

| | | | |
|---|---|---|---|
| 21,000 | in February, | War Department | $2,257.50 |
| 29,000 | in April, | War Department | 3,117.50 |
| | | | $5,375.00 |

$268.75, Peter Bauduy's commission at 5 per cent. $1,220.77, carried to Peter Bauduy's account current.

## Schedule 4.

Indorsed, 1811, 1812, 1813. Peter Bauduy's account current settled at the end of each year. These accounts were written in Mr. Bauduy's book by R. Duplanty. They were settled at the end of every year, and corresponding entries made in the books: Mr. Bauduy examined those accounts as well as the books and did not object against those accounts. Balance in favor of E. I. du Pont and Co. $29,722.98 which, with a balance from old account brought down omitted January 1, 1812, $250.10 and interest 12 months $15.00, makes the balance $29,988.08.

Gun powder sold in 1811 by themselves and
their agents           [kegs]   7,958   $145,554.43

| | | | | |
|---|---|---|---|---|
| | 1812 | [kegs] | 7,278 | 137,475.04 |
| | 1813 | [kegs] | 5,914 | 144,010.57 |

These accounts also state Mr. Bauduy's commissions.

## Schedule 5.

This is an account between the parties in the year 1814. The balance there stated to be due to Du Pont *et al.* is $56,128.89. There is a statement of gun powder sold.

The several articles of association and agreements made between the parties do not materially vary. The differences arise from translations made by different persons. I therefore do not copy them, as they are all inserted in the notes of plaintiff's bill.

## [Schedule D.]

Then *D* contains a schedule of indorsed inventories: January 1, 1810, June 30, 1814, December 31, 1814, as follows:

JANUARY 1, 1810. *Eleutherian Mills, near Wilmington. Inventory of the money, prime materials, gun powder manufactured, bills receivable, goods and landed property mortgaged over to us, land property of our own, buildings on the same, utensils and debts belonging to us, E. I. du Pont de Nemours and Co., as also of the debts due by us to others, viz (not copied here exactly):*

| | |
|---|---|
| Cash and ready money in the Bank of Delaware | $1,911.66 |
| Saltpetre in our own store, and due to us by the War Department, 12,777 lbs. at 23 cents | 2,938.71 |
| Brimstone in our store, 5,179 lbs. at 6½ cents | 336.63 |
| Wood for charcoal, ready peeled, 36 cords at $12 | 432.00 |
| Empty barrels fit to receive gun powder, 179 at $1 | 179.00 |
| Empty kegs, 568 at 25 cents | 142.00 |
| Gun powder for sale in the hands of various agents 1,318 kegs, 2 barrels | 18,508.00 |

| | |
|---|---:|
| In our own store 5,844 lbs. at 56 cents | $3,272.64 |
| Kennedy's acceptance $1,000; Wilson's note $130 | 1,130.00 |
| Store goods in the hands of Aug. D'Autrement *per* inventory | 2,649.00 |
| Landed property in the County of Allegheny mortgaged to us | 3,063.97 |
| 65 acres of land with the right of using the water of the River Brandywine, including a dam in good order, and the canals necessary to distribute water to the works hereinafter enumerated and described, the whole of which is valued at the moderate price of | 12,000.00 |

| | |
|---|---:|
| Carried forward, | $46,563.61 |
| (January 1, 1810.)   Amount brought forward, | $46,563.61 |
| A good stone dwelling-house 64 by 33 feet, convenient outhouses together with a stone barn, 45 by 30 feet, stables, 6 team horses with their necessary harness and the necessary carts and wagons, to the use of the factory, valued at | 7,100.00 |
| Three stone houses and two wood framed houses being used as dwelling-houses for workmen, together with their furniture, valued at | 2,000.00 |
| A large stone building 110 by 30 feet intended for purifying saltpetre, together with its kettles for evaporation, cooler, drying pan, pans, boxes and tubs for crystallization and generally all the necessary utensils for refining saltpetre, valued at | 5,500.00 |
| A wood framed building containing kettles for the refining of brimstone, and two iron cylinders fit to burn wood into charcoal, together with the necessary apparatus to use the kettles and cylinders, valued at | 800.00 |
| A spacious wooden building wherein the charcoal wood is piled up and prepared, with two brick kilns intended for burning wood into charcoal, and also a storehouse wherein the charcoal is preserved, | 900.00 |
| Three wood framed houses one of which is used for weighing and mixing the prime materials; the second for storing the empty kegs etc.; and the third is bestowed to the joiners and carpenters constantly busied about the necessary repairs valued | 600.00 |

A stone building 43 by 33 feet with a spur, the walls of which have been made very thick and strong for the purpose of securing, if possible, the other adjacent buildings against the dangers of explosions, which building contains two dozen of brass stampers which are put in motion by an hydraulier (hydraulic) wheel, together with a double machinery to be used in case of accident, $2,600.00

A spacious wood framed building 70 by 45 feet containing the whole necessary apparatus for granulating gun powder together with two brass presses, part of which machinery is set in motion by an hydraulic wheel, 3,000.00

A wood framed building 38 by 34 feet containing the necessary apparatus for glazing gun powder, the machinery of which is set in motion by an hydraulic wheel, 2,000.00

A wood framed sawmill 60 by 12 feet, 250.00

$71,313.61

(January 1, 1810.)  Brought forward, $71,313.61

A stone building 36 by 30 feet containing two large mill stones with the necessary apparatus for pulverizing sulphur, the whole machinery being set in motion by an hydraulic wheel, 2,000.00

A wood framed building 40 by 30 feet containing the whole necessary apparatus for making gun powder after the process called "*procidi revolutionaire*" which machinery is set in motion by an hydraulic wheel, 1,800.00

A stone building 33 by 16 feet, with a spur and very thick strong walls, together with a good cast iron stove; the said building used for drying gun powder, 1,250.00

Wooden frames and tables whereupon gun powder is exposed to the rays of the sun, 250.00

A stone building 26 feet square erected upon a masonry work, 6 or 7 feet above the level of the ground, for the purpose of preventing dampness and compassed all round with an outward wall, 4 feet distant from said building used as a magazine for storing gun powder ready made, 600.00

A small stone house intended for weighing gun powder, keeping samples, and the like, 100.00

Amount due by several persons whose names will be discriminately inserted in the Journal and whom we consider able to pay, $31,819.36

Amount due by several persons whose names will also appear in the Journal, but whose debts we consider unsafe, and enter them for only ¼ of the amount *viz* $379, say ¼ is 94.75

$109,227.72

We are indebted as follows:

To Jacob Broom, balance due him to complete the payment of our landed property aforesaid, which balance bears interest agreeable to our bond, 1,091.05

From amount of our promissory notes, as under (here the amount of six notes are given, numbers and when payable)—total, 6,900.00

Amount due to several persons, whose names will appear in the Journal 18,707.94

Amount due to several workmen, as by statement in workmen's book, 2,279.42

$28,978.41

Difference composing our effective stock $80,249.31

$109,227.72

———

JUNE 30, 1814. *Inventory of the money, prime materials, gun powder, landed property and debts belonging to us, E. I. du Pont de Nemours and Co., as also debts due by us to others.*

### Prime Materials:

6,242 lbs. refined nitre in our store, at 44 cents, $2,922.48

180,463 lbs. crude nitre (in various stores of other people) due by C. W. and in our store, valued at 36 cents, 64,966.68

9,361 lbs. brimstone [at] 10 [cents], 936.10

238 cords coal wood, at $10, 2,380.00

$71,205.26

### Gun Powder:

| | |
|---|---|
| 15,840 lbs. gun powder, not finished, at 48 cents, | $7,663.20 |
| 15,100 lbs. gun powder, ready put up in barrels, [at] 52 cents, | 7,852.00 |
| 65,550 to be sold by the under named persons (their names, and quantity each has to sell, are given: total, 65,550) valued at 56 cents, because part of it was sold before, prior to the depression in price. No account of sales is received. | 36,708.00 |
| 40 cannisters of fine Eagle Powder, at Briscoe and Partridge's, at $1, | 40.00 |
| | $52,263.20 |

### Cooper's Articles:

| | |
|---|---|
| 908 powder barrels, averaging $1.30, | $1,180.40 |
| 20 half barrels [averaging] 75 [cents], | 15.00 |
| 2,360 common powder kegs 25 [cents], | 590.00 |
| 52 large kegs for eagle 30 [cents], | 15.60 |
| | $1,801.00 |
| Ready money (In Bank of Delaware, $3,642.63; Wilmington and Brandywine $5,003.[0]6; Farm[ers'], $1,546.82), | $10,193.08 |
| Bills receivable (two from different persons), | $1,477.01 |
| Real Estate, 65 acres of land called the Eleutherian Mills with the privileges and buildings mentioned in inventory of 1809 (*quaere*. 1810. See pages 202, 203) $42,750.00. Deduct for the depression in the value of the buildings and utensils, notwithstanding occasional repairs, $2,750.00, | $40,000.00 |

## Additional buildings erected:

| | | |
|---|---|---|
| 4 double, 2 single stone houses for workmen built since January 1, 1810 | $2,300.00 | |
| 2 large wooden buildings for coal wood | 850.00 | |
| 1 large wooden building for dusting powder and putting it into barrels | 600.00 | |
| | | $3,750.00 |

|  |  |  |
|---|---|---|
| Carried over, | | $180,689.55 |
| June 30, 1814. Inventory etc. brought over, | | $180,689.55 |
| 1 frame building at the place where the sawmill used to be, with a new apparatus for granulating gun powder, and a water wheel, | 750.00 | |
| Addition made to the pressroom, and two new presses in brass | 1,400.00 | |
| A stone building added to the refinery with two kettles of evaporation | 1,900.00 | |
| | | $4,050.00 |

65 acres of land known by the appellation of Hagley, with the right of using all the water of the Brandywine, including a stone dam requiring little or no repair, the races and necessary gates to convey the water to the wheels at an elevation of from 14 to 18 feet above the level of the river, the said property to be, if required, divided as follows, *viz:*

(1) About eight acres of land being a fine place for building with the privilege of using ⅓ of the water of the Brandywine, with 18 feet of fall, at     $6,500.00

(2)  About ten acres of land whereupon are now standing the most part of the buildings of Hagley with the privilege of using ⅓ of the water of the Brandywine, with a fall of 18 feet,                        $10,000.00

On that property are the buildings hereafter enumerated, to wit, a good stone dwelling house, with four rooms on the ground floor, and as many on the first story with a garret, a cellar, icehouse and other conveniences, a frame building adjoining the said house, and has a parlor with a bedroom upstairs, a workman's house in the rear, with two rooms or kitchen on the ground floor, three rooms above, and a garret,                        4,500.00

A small wooden house where workmen live,                        300.00

A wooden coach house with a garret for grain,                        150.00

A large stone building, with stables underneath, actually full of coal wood,                        1,000.00

A wooden house for workmen,                        300.00

A large three story building, formerly a cotton factory with a good water wheel,                        3,000.00

A stone and wood building used as a smith shop with three fire places, necessary tools, a tilt hammer and water wheel,                        750.00

An old wood building with two water wheels, formerly a slitting mill, with utensils and rollers, or cutters necessary to carry on that business,                        800.00

About 45 acres of land whereupon stand the new powder works with the privilege of ⅓ of the

water of the Brandywine, at an elevation of 12 or 14 feet, $14,000.00

On that property are now standing a wooden frame house, not yet finished, intended for the directors of the mills, 1,500.00

A new workmen frame house, 350.00

A stone workmen frame house adjoining to the wooden one, 450.00

A large workmen stone house, 500.00

$44,100.00

$228,839.55

June 30, Inventory etc. brought forward $228,839.55

An old workmen stone house with a wooden adjoining it, $450.00

A large stone stable with a large garret to receive hay, 800.00

Wagons, carts, timber, wheels horses, oxen, and geese, 850.00

A wooden sawmill in good order, 350.00

A stone building used as a coal wood store, 250.00

A coal kiln with its roof, 75.00

A stone building used as a coal store, 275.00

A frame building called composition, with its troughs, scales and buckets, 400.00

A frame building for dusting powder and putting it up in barrels, with its necessary tools and implements, 500.00

A large frame building called granary, with the necessary apparatus for granulating powder by hand, 1,200.00

A frame building with four brass presses, and other implements necessary to make powder casks, 2,600.00

Foundations and carpenter's work for magazines, 150.00

| | |
|---|---:|
| A stone mill with its water wheel and the necessary apparatus for preparing gun powder by the revolutionary process, | $2,400.00 |
| A stone pounding mill with its water wheel and interior machinery complete, | 2,500.00 |
| A stone drying house with a cast iron stove and wooden porch or antechamber, | 1,600.00 |
| | $14,400.00 |

#### Property mortgaged to us:

| | |
|---|---:|
| Land situate in Genesee County, State of New York, principal and interest to this day, | $7,428.84 |

#### Book debtors:

| | |
|---|---:|
| Doubtful and insolvent ("Doubtful debts: left in suspense."), | $8,532.53 |
| Not stated to be doubtful or insolvent, including an account against Peter Bauduy to the amount of $56,128.89 and E. I. du Pont's proper account, $42,060.93, | $112,119.77 |
| | $371,320.69 |
| Deduct an error, as I suppose in my addition; not having copied, in form as annexed to the bill, and having sometimes abridged, and therefore perhaps made mistakes. | $8,592.53 |
| Total amount belonging to us, | $362,728.16 |

We owe as follows, returned individually in schedules and separately:

Bills $4,022.50. Five bonds to Thomas Lee, last payable March 9, 1819, $26,550.00. Book creditors, among others,

U. S. War Department, $49,-058.92,       $188,310.93

Difference composing our effective stock,       $174,417.23

DECEMBER 31, 1814. *Inventory of the money, prime materials, gun powder, ready made, landed property and debts belonging to us, and also of the debts due by us, viz:*

| | |
|---|---:|
| Prime materials, *viz,* nitre, sulphur, in their various states and conditions, all being particularized, in what contained, and where deposited; and also charcoal wood, | $67,790.77 |
| Gun powder (particularized), | 32,464.08 |
| Cooper's articles, | 534.00 |
| Ready money, in bank, | 5,623.20 |
| Bills receivable, and treasury notes, | 13,477.01 |

### Landed property:

| | | |
|---|---:|---:|
| 65 acres called the Eleutherian Mills with the privileges, buildings and utensils described in our inventory of June 30th last, | $47,800.00 | |
| 63 acres of land called Hagley, with the privileges, buildings and utensils, stated in our inventory of June 30th last, | 58,500.00 | |
| | | $106,300.00 |

### Mortgages:

| | |
|---|---:|
| Land situated in the Genesee County, State of New York, capital and interest, | $7,645.21 |
| Debtors *per* ledger (the amount due from each debtor is stated, but the whole is not added up and carried out) | |
| We owe as follows (promissory notes or bonds) : | |
| Notes in favor of Du Pont, Bauduy and Co. January 16, | $3,000.00 |

Bonds, Thomas Lea [*sic*] (five payable annually, beginning March 9, 1815, and ending March 9, 1819),                    $26,550.00

|  |  |
|---|---|
|  | $ 29,550.00 |
| Creditors *per* ledger, | 133,988.49 |
| Total amount due by us, | $163,538.49 |

### Recapitulation:

|  |  |
|---|---|
| Amount due to us, as stated (refers to the schedule), | $370,190.35 |
| Amount due by us as above | 163,538.49 |
| Difference composing our actual stock, | $206,651.86 |

---

This cause came on for hearing September 1, 1817.

*McLane* and *Read, Jr.,* for complainant.

*Read, Vandyke,* and *H. M. Ridgely* for defendants.

*Read, Jr.,* reads the bill. See abstract. *H. M. Ridgely* reads the answer. Defendant says that the accounts were stated and settled between complainant and defendants. Complainant not entitled to 2½ cents *on sales*; but on the proceeds of sale.

April 21, 1801, original Articles of Association, at Paris (above).

August 25, 1802, Articles with Peter Bauduy, at Wilmington (above).

July 1, 1805 further Articles with Peter Bauduy, at New York (above).

December 31, 1809, Renewal of Partnership, at Wilmington (above).

February 15, 1815, Articles of Separation [at] Philadelphia (above).

No. 1.   On account stated February 24, 1806, balance due to Peter Bauduy is   $11,260.33

No. 2.   Account to December 31, 1809 balance due to E. I. du Pont and Co. (his commissions are carried into this account.)   $ 5,792.62

No. 3.  Account to December 31, 1810, bal-
          ance due to E. I. du Pont and Co.        $87.77
No. 4.  Account to December 31, 1813, com-
          prehending three accounts.  Bal-
          ance due to E. I. du Pont and Co.     $29,722.98
        Account to June, 1814 balance due
          to Du Pont                            $56,128.89
        Account closes and leaves a balance
          to Du Pont                            $ 9,058.07

*McLane,* for complainant, reads depositions on the part of complainant, *viz,* Vital M. Garesche, Peter Stephen Duponceau, Paul Beck, John Leaming.  Letter of Madame de Pusy to Mr. Bauduy, dated September 22, 1814.  The translation of the Article of Agreement August 25, 1802 (a little different from my abstract). Translation of Articles of July, 1805, made at New York, not correct, say defendants' counsel.  Original propositions made by Mr. Bauduy, and answered by Mr. du Pont.  Letter Mr. du Pont to Mr. Bauduy to explain the allegation that $1,000 have been twice charged to Mr. Bauduy, in the purchase of mill seat.  Here *McLane* concluded his testimony, reserving the liberty of offering other, on hearing the evidence of the defendants.

*Vandyke* for defendants.  Reads depositions of Francis S. Cox, aged 28 years; Archibald McCall, 50 years and upwards; Callender Irvin, Commissary of Purchases for United States; Thomas Shivers, 40 years; Jeremiah Warden, Jr., 37 years, taken in Philadelphia; Victor du Pont; Caleb Kirk of Brandywine; Anthony Gerard of City of New York; Raphael Duplanty; Jacques Antoine Biderman.

William P. Brobson was sworn to translate papers, in the following words, "You do swear on the Holy Evangelists of Almighty God that you will well and truly translate from the French language into the English language all such letters and papers, as shall be here offered and exhibited to you, in this cause, according to the best of your knowledge and ability?"

[Offered by counsel for defendants:]

No. 1.  Letter from Peter Bauduy, not dated, nor addressed to anyone; but, from the context, it appears to have been addressed to Victor du Pont (brother of E. I. du Pont, defendant).

No. 2.  October 24, 1809.  Peter Bauduy to Irenee du Pont (not read).

No. 3.  A letter from Peter Bauduy.  No direction nor date, not translated by Mr. Brobson but by somebody else. As Mr. Brobson read the translation Mr. Bauduy and Mr.

Garesche (his son-in-law) who both understand English (Mr. Garesche very well), held the original.

No. 4. July 2, 1812. Letter, Peter Bauduy to Irenee du Pont.

No. 5. Peter Bauduy to Irenee du Pont, without date.

No. 6. Peter Bauduy to Irenee du Pont, without date.

No. 7. March 28, 1813. Peter Bauduy to Irenee du Pont.

No. 8. June 20, 1814. Peter Bauduy to Irenee du Pont.

No. 9. June 21, 1814. Peter Bauduy to Mr. Sesseney, copy, read without objection.

No. 10. July 19, 1814. Peter Bauduy to Irenee du Pont.

No. 11. July 22, 1814. Peter Bauduy to I. du Pont.

No. 12. Peter Bauduy to Victor du Pont, without date.

No. 13. Without address, or signature, or date, in Mr. Bauduy's writing.

No. 14. No date. V. M. Garesche to E. I. du Pont.

No. 15. Propositions, and calculations about Mr. Bauduy's commissions, original written by Victor du Pont. This was objected to by complainant's counsel and rejected by THE CHANCELLOR.

No. 16. Objected to and not read, being withdrawn by defendants' counsel without argument or opinion of Court.

No. 17. Account between Peter Bauduy and Eleuthere Irenee du Pont and no others.

*McLane*, for Bauduy, objects to the paper being read in evidence, because: first, the paper is not evidence of the sale of land, it is not signed by the parties; second, the bill is filed for settlement of accounts between the complainants and other partners, no account but that of Peter Bauduy with the company is evidence here. The account offered in evidence relates to Du Pont and Bauduy alone. It has no relation to the case stated in the bill and answer.

*Read* for defendant. In the bill it is complained that the defendant has been twice charged for land sold, therefore he has made it a part of the case; and surely we may show that in the account relating to this land, he is but once charged. In the bill it is made a gravamen that he has been twice charged $1,000, the price of land; and we mean to show that he has been but once charged.

*McLane* for complainant.

THE CHANCELLOR. This paper, in the form of an account, charging the sale of land is not evidence. Our Act of Assembly requires some writing signed by the party charged upon a contract on sale of land.

*Read* then read book for recording deeds, containing an indenture dated June 15, 1813, Eleuthere Irenee du Pont de Nemours and Sophie his wife to Peter Bauduy, 10¼ acres and 17 perches land on north side of Brandywine.

*Read, Jr.,* objects to this deed being read or received as evidence. This deed is offered to support the charge of $1,000 in the account against Peter Bauduy. This is not evidence in this cause, because this is a bill against E. I. du Pont and others to settle a partnership account. A private account of one partner cannot be set off against complainant on such a bill. This account is no discount against complainant and partners. By the Philadelphia Agreement, February 15, 1815 (above), this partnership was to be settled on certain terms. By the third article the parties of second part are partners. This article refers to accounts of partnership and to none others. He is to pay the company in certain events, and they in other circumstances. This a distinct and separate matter no way relating to the company; cannot be introduced. They attempt indirectly to support their charge by proving a sale of land. Still they have no right to mingle these accounts.

*Read.* We for the present withdraw the deed to prevent the party from asking an improper decision.

Vital M. Garesche sworn to prove book of Mr. Bauduy. Pages 10, 11, 12, 13, 14, 15, 16, 17, are in the handwriting of Mr. Duplanty. The calculations on a loose sheet, in Mr. Bauduy's and witness' (not part of the book). Page 1 to 7 inclusive (except 4 lines in page 7 which are in Mr. Duplanty's writing) are in Mr. Bauduy's. Page 40, 9 first lines are Mr. Duplanty's, 9 following Mr. Bauduy's, 5 following Mr. Duplanty's, 3 following Mr. Bauduy's. Page 41 in Melon's or Mullen's writing; so 43, 45, 46, Duplanty's; dates Melon's. Page 47, a part Mr. Duplanty's (8 first lines), rest Melon's, except 2 lines about center, figures and calculations of Mr. Duplanty. Page 49, Mullen's, except calculation of interest. Page 50, Mr. Duplanty's. From 58 to 69 inclusive, Mr. Duplanty's and Mr. Mullen's, except 8 lines by Mr. Bauduy. (On examining the book the different writings are very distinguishable. They are all written by Bauduy, Duplanty, or Mullen: and seeing these writings I know sufficiently who wrote the respective parts without here noting it.)

*H. M. Ridgely* for defendants:

In support of first plea produces in evidence
Ledger No. 4, fol. 27, Account of P. Bauduy

| | |
|---|---|
| with the company | $12,501.75 |
| Deduct commissions. Balance is | $11,260.33 |
| Commissions were | $1,241.42 |

Also Mr. Bauduy's account, pp. 150, 151. See Duplanty's deposition. Answer to the 2nd additional interrogatory.

Ledger 4, fol. 27, 189, 191, 192. *Second account in support of second plea.* See Schedule. Complainant's book, 156. Settlement, December 31, 1809. See Duplanty, 5th additional interrogatory.

Ledger 8, fol. 88. Third account supports third plea; begins January 1, 1810. Complainant's book, 46. Balance due from him, $421.11. Duplanty's deposition to 5th additional interrogatory.

Ledger 8, fol. 88, 89, 90 and pages [——] [16], [in support of] fourth plea. This account is for 1811, 1812, 1813. Last date to December 30, 1813. Balance due to company $29,-722.98. See Mr. Bauduy's Book p. 64. See Duplanty's deposition to 6th additional interrogatory. Schedule 4.

Fifth plea. Ledger 8, page 90. Balance, $56,128.89 due to company to June 30, 1814. See Bauduy's Book p. 69. Sent to Mr. du Pont, March 9, 1815 (after agreement). Mr. Duplanty's answer to 8th additional interrogatory. Proposal No. 13 (see above). January 1, 1810 or rather December 31, 1809, inventory of whole concern. Schedule. Whole amount $109,227.72. Debts due from company $28,-978.[0]4. Difference, $80,249.31. (See above.)

*Read* for defendant. To explain the difference between Schedule *A* to bill, account of powder sold according to Mr. du Pont's book, and Schedule *B*, we offer a book, the account of powder manufactured at the Eleutherian Mills. The prices in the book (Schedule *A*) are imaginary, not the real price for which powder was sold. These were rough estimates, to presume the probable value of powder sent to market. Ledger No. 9 in evidence. We also exhibit same book which contains an account of the powder manufactured.

Mr. Duplanty, sworn. Proves handwritings in this Ledger 9. This is a memorandum book kept by Mr. du Pont. He proves Mr. Bauduy's book, it is his account current book. Some of the entries are in witness' hand writing. Such as witness made, he

---

[16] Blank in manuscript.

made, as he considered, under the authority of Mr. Bauduy. The entries made by Melon were made by witness' direction, and he considered by authority of Mr. Bauduy. This book was understood by witness to be Mr. Bauduy's account current of his transactions with the company. Pages 10 and 11 are in witness' handwriting, witness considered made with knowledge of Mr. Bauduy; but he never told witness to make them. (See Garesche's testimony as to this book, p. 212. This testimony of Duplanty rather discredits the book, as to establishing the book, exclusively to be the book of Mr. Bauduy.)

Mr. E. I. du Pont, sworn to prove book. Ledger 9 was kept for his own satisfaction, and is a memorandum book for the charges of powder sent out of the factory. An account of powder sold, and of powder sent to the agents for sale.

(NOTE. The defendants say that they ought not to be charged with the whole sum or quantity entered in this book; but that when sold, or accounted for, the persons selling are charged with the actual sum. Defendants' counsel want Mr. Duplanty verbally to explain these entries, to show where powder was sold, and where it was sent merely to the agents. Well then, let the account, I say, of the agent be produced to show therefrom the actual sales, and not from Mr. du Pont. This is an account of sold, and sent to agents to be sold. As to the prices of powder sent to agents, *quaere:* Cannot the defendant show from their returns of sales, the actual prices?)

Here *Read* concluded the testimony of defendants, reserving the liberty of rebutting by other testimony, anything more on the part of complainant, as he reserved the liberty of going into further proof, after defendants had closed.

(Why did not defendants produce the accounts of sales of powder made by their agents, and show the price or prices at which it actually sold?)

*Read, Jr.,* for complainant. Reads in evidence original propositions from Mr. du Pont to Mr. Bauduy. Not dated; but they preceded the Wilmington Agreement of August 25, 1802. See that Agreement as to sales, above. He then argued on the part of the complainant.

First, as to the private account of E. I. du Pont against complainant being included in the partnership account against defendant. The account is irregular and erroneous as it admits of such a charge. The set-off must be in the same right with the demand. Mr. Bauduy's private account has not been charged against E. I. du Pont, or the concern, therefore he is wronged. The Articles of 1815 (above) confine the company and Peter

Bauduy to their mutual dealings. The fifth item clearly excludes E. I. du Pont's account. The moment the private account comes into the partnership account the balance spoken of is no more a balance due to or from the company. The balance due for mill seat of E. I. du Pont by Peter Bauduy, $1094.45. See account; mill seat is twice charged.

Second. The affair of commissions. We were allowed commissions on the net proceeds instead of the gross amount, or sum for which powder was sold, without deducting charges. Where account is erroneous, hardly any acquiescence will support them. In all the accounts this error runs through them. The fourth article of the Wilmington Agreement, August 25, 1802 secures these 2½ per cent commissions upon the proceeds of sale of powder manufactured in the mill. "Proceeds of sale," mean what the article brought at market, an equivalent for the thing sold, and *all it brought*. By Article 2, Mr. Bauduy is to attend to the sale of powder, and purchase raw materials. The fourth article gives 2½ [per cent] on proceeds of sale, that is, what the article produced at market. The New York Agreement, July 1, 1805, second item (above), gives commission upon *all* sales. Here, "proceeds" being taken away, the words "on all the sales" leave no doubt. This is a construction which the parties themselves make. It refers to *all* sales made according to agreements subsisting between the parties. The Agreement, February 15, 1815,[17] 3rd article (above), refers to his commission of 2½ per cent "on sales," not on proceeds. This drops "proceeds," as the New York Agreement did. "Proceeds" at most is equivocal, but by these two agreements, the proceeds of sales are explained to be sales. We never got but 2½ per cent on money *actually received*.

The propositions made by Bauduy, and proposals by Du Pont strengthen this construction. Peter Bauduy in his propositions says a commission of 2½ per cent on the sales, Mr. du Pont's answer speaks of 2½ "on the sales." Mr. du Pont's own proposal speaks of 2½ per cent on "proceeds of sales," and afterwards of 2½ "on the sales." The parties used "proceeds of sales" as the word "sales". Commissions on sales, they use. Du Pont calculates in figures on the sales. Before the Agreement, parties construed "proceeds of sales" the same as sales, so by their solemn agreement afterwards. (Rees's Encyclopedia, title, "Factor". Commission means compensation clear of all charges.) Mr. Duponceau proves that we are entitled to 2½ per cent on sales. He is not a merchant and has no interest to exaggerate

---

[17] Manuscript reads "1805," but "1815" is plainly intended; see above for date of this Agreement.

or diminish commissions. He is a man of science. He is an interpreter, and a lawyer concerned in commercial cases. His testimony is entitled to great respect, great good sense. Words are to be construed according to their use. Commissions are charged on gross proceeds, and if they had intended net proceeds, they would have put it in; for commissions on proceeds means the gross proceeds. Paul Beck is also entitled to great respect. "Proceeds of sales" means 2½ per cent on gross sales. "Proceeds of sales" is the opposite of "net proceeds." Leamy. The words mean 2½ on gross proceeds.

Mr. Garesche, though a son-in-law, deserves more weight than defendant's witnesses, who are more intimately connected with him than as son-in-law. "Proceeds of sale" means the price for which the article actually sold. Mr. Duplanty the principal witness on the other side. He did not use French words, according to his construction, when used by others. His answer to 12th additional interrogatory. He says there is a wide difference between proceeds of sales, and amount of sales, but in Mr. Bauduy's Book, so miscalled, he uses the words "net amount," making amount and proceeds to mean the same thing. He admits Bauduy to be at times entitled to 2½ on gross sales, and at other times to 2½ on net sales.

Answer to 12th additional interrogatory: How is Bauduy entitled to commissions? By the Article of Agreement, and under that article, Duplanty proves he received at times commissions on gross proceeds, and on net proceeds. It could not be narrowed down to net proceeds. If we are entitled in one case, we are in all, to 2½ on gross sales. (Biderman, answer to 12th additional interrogatory, as to proceeds of sales).

*Read, Jr.* Third error. The complainant on two contracts with the United States for powder is allowed 5 per cent on the re-manufacture thereof, instead of 2½ on the manufactured. They call the manufacture and selling, a re-manufacture. Powder Book, Ledger 9, under date February 27, 1813. Amount of powder. February 28, 1810, case of re-manufacture. See Callender Irvin's deposition. We only get a commission of 5 per cent on the labor of working up the materials of the United States. It is not a case of re-manufacture; for they buy the materials furnished by the United States, manufacture them, and then sell them to United States and call it re-manufacture.

Fourth error. See my book (above) as to Mr. Garesche and Raviseer.

Fifth, as to charge of usurious interest. They cannot legally pay usurious interest and charge Mr. Bauduy. It is illegal and

cannot be sanctioned in this court. Since 1810 (see above) profit and loss was put out of the question. Mr. Bauduy relinquished his profits, and cannot be charged with loss. He is charged with compound interest. Account of E. I. du Pont and Co., under date December 31, 1814, charges complainant with powder sold to G. Read (see above item 5). On opposite side 2½ per cent is allowed us. This account is open from December 31, 1813 to February 15, 1815. The defendant must admit the account is open from June, 1814. Their last plea is a stated account to June 1814. Between June, 1814, and February, 1815, we are entitled to an account. But there is no question that the account is entirely open from December 31, 1813 to February, 1815, and to this time. Under date, June 30, 1814, Journal 7, pp. 208, 9, 10, 11, 12. Page 211, see *Nota Bene* as to bad debts. June 30, 1814, p. 212, where it is stated no final settlement. This entry is an answer to their plea. So it appears there was no settlement in 1814. See Book. This opens the account in 1814. They have not accounted for powder sold to the United States. That is, they have not credited on this book any commissions. They sold more powder to the United States than to all others.

$219,240.00   Amount of powder sold to the United States, and yet in Mr. du Pont's account.

$160,000.95   Whole amount of all powder sold.

---

$59,239.05

We lose our commissions on $59,239.05 besides on other powder. We are entitled to [commission] powder delivered to the United States. The money becomes due on the delivery; and we are entitled to commissions on the money coming from the United States, though not paid. Accounts never settled. Not kept so as to lay foundation for settlement.

Mr. Duplanty states that Mr. Bauduy's book is a copy from accounts or papers furnished by Mr. Duplanty. It is not a day book, nor journal. They find a name and call it Mr. Bauduy's Book of Account Current. Yet it was a book copied from data furnished by Duplanty. They could not want Mr. Bauduy's private book to settle a partnership account. Yet they say they could not settle without this book, this private book. There could have been no settlement to 1806. Next plea comes to December 31, 1809. They strike a balance, but on January 1, 1810 they find their own balance incorrect and reduce the balance from $421.11 to $87.77, which they call the real balance.

As to plea, see Ledger 4, fol. 27, account of February, 1806. There they say this is subject to revision. Balance in favor of

Peter Bauduy. This demonstrates that that account was not settled. Mr. Duplanty stated that from 1810 to 1813 he was concerned in the woolen factory; that the accounts for 1811 and 1812 were kept in memorandums. See testimony of Mr. Garesche, his answer to 6th interrogatory. By agreement, February 15, 1815, Mr. Bauduy gives up, as far back as January 1, 1810, which evinces that parties did not consider any account closed since January 1, 1810. If the accounts were settled in 1813, would they not have referred to 1813, because then, only from 1813 would accounts be open? But by agreement they considered accounts open to January 1810, and got Mr. Bauduy. to go back that far to renounce profits. If accounts were settled to December, 1813, why renounce profits to January, 1810?

We are entitled to a decree; for, if the accounts are stated, they may be opened to surcharge and falsify. But the whole is open since June 30, 1814; and certainly open during the whole of 1814, as from their own book, which entitles us to an account for 1814. Mosely['s Chancery Reports, 296, *Rodney v. Hare et al.*]; if court sees errors they may either decree an open account, or give the party leave to surcharge and falsify.

*H. M. Ridgely* for defendants. Speaks of original agreement; the choice of the Brandywine for the site of the factory. Articles of August, 1802, by which Mr. Bauduy became a partner; the services he was to perform. Each shareholder, by first agreement to receive 6 per cent on their stock annually, and share of profits when dividend made. Little profits between 1802 and 1805. Mr. Bauduy dissatisfied. July 1, 1805, Articles at New York. By these he was to receive 5 per cent when materials were found by the person having powder manufactured, and when the Company did not purchase the materials.

([NOTE.] But suppose, as the United States furnished materials, and the Company credit the United States for these materials at market price, and then sell, or furnish them powder at the market price, and deduct the price of materials, is this a manufacture of powder wherein the purchase of raw materials does not enter? At present I think not. Because, by the operation, the Company make it a purchase of raw materials, and a sale of the powder. However the procuring the raw materials, that is, the trouble of seeking for them etc. etc., is not incurred.)

I shall confine myself to the pleas. Complainant specifies a number of errors, and therefore says that they are not settled accounts. The account for land sold by E. I. du Pont to P. Bauduy to amount of $1000 is not in any of the accounts pleaded in bar. It is in the account December 31, 1814, subsequent to

the accounts pleaded. So the extra interest is in none of them, that is, in the accounts from June 30, 1814 to December 31, 1814. These accounts were kept by Mr. Bauduy. (*Quaere.*) In 1806 Duplanty occasionally inspected the books. In 1810 he became bookkeeper. Bauduy had as much share in charging private accounts, though Duplanty was bookkeeper. Bauduy saw and knew every entry, and as to private accounts, he never objected till this bill was filed. From 1802 to February, 1815, Mr. Bauduy consented to every entry. These entries do not affect these pleas, being subsequent to them. The extra interest is in account December 31, 1814; whole sum is $3584.90. Mr. Bauduy's share $2050.10, Mr. du Pont's $1534.80. These gentlemen had the funds in their hands, and if the Company had to pay extra interest why should not Bauduy and Du Pont pay it, who had the funds of the company in their hands? Du Pont charges himself proportionally with Bauduy. Du Pont's debt to the company was $45,720.14, Bauduy's $61,071.60 (mill seat deducted). Mr. Bauduy objects to pay the extra interest because it was obtained after 1810, after the time his share of profits was renounced (see Agreement, above). Profits accrued after January 1810 were renounced. But still Mr. Bauduy owed the money; the company was forced to borrow, and it was a fair charge against all the parties. He was answerable as a partner till 1815; and whatever happened before, he was bound to bear a part.

They object to the commissions on powder manufactured for the United States. According to the agreement, July, 1805, Article 2, Mr. Bauduy was entitled only to $2\frac{1}{2}$ [per cent] on powder made for the United States because the United States furnished the materials. The entries of prices in Powder Books, Ledger 9, are merely nominal. The United States furnished the materials, and the company received pay for their labor only. Book No. 10 shows the transaction between the United States and company. (NOTE. *McLane* says they deny that the United States furnished materials.) Whole contract with the United States, 1812, for 200,000 lbs. came to $44,700. Commissions to Mr. Bauduy $2,235.00. Contract for 550,000 lbs. at [——] [18] *per* 100, — $20.19 (1813). Proceeds of 180,400, dated June 30, $36,422.76. Commissions 5 per cent, $1,821.13. Ledger No. 8 fol. 209. See these entries. Account with the United States, June, 1814, Journal, see account U. S. The number of pounds of powder is correct; the price is not. He was not entitled to $2\frac{1}{2}$ per cent on the powder, as sold to the United States, but to 5 per cent on the labor bestowed on manufacturing powder for the United States.

---

[18] Blank in manuscript.

As to money paid to G. D. Read. This objection is not insisted on by complainants counsel. As to interest on money drawn from Garesche and Raviseer, the money he drew over the money of the company. The plan was to charge interest against the parties; and it was right to charge him. All he drew ought to bear interest. This is between him and the company and has no relation to Garesche and Raviseer. As to money furnished by Bauduy to the company, there is no proof that he furnished any.

Then as to commissions. The great objection made to the accounts is that Bauduy is only credited with 2½ per cent on the net proceeds, and 2½ on the amount or gross sales. He refers to the several Articles of Agreement and comments on them. (The whole agreement and evidence must govern this point. See also propositions Bauduy to du Pont, and *vice versa*.) The propositions were made before the contract of 1802. McCall's testimony proves that the commissions arise on net proceeds. So the testimony of the other witnesses. From 1802 to 1814, his commissions are all charged; some in Mr. Bauduy's own hand, over and over again at 2½ on the net proceeds. See Bauduy account of 1806. We support the pleas. First, plea No. 1 annexed to answer in Mr. Bauduy's account. (As to supporting pleas, see these notes, above. The books etc. referred to.) Mr. Bauduy's letter, No. 13, admits balance due July 1, 1814. His admission of the balance proves the settlement and concludes him as to commissions. 2 Ves.Sr. 565, *onus probandi* lies on the party having liberty to surcharge and falsify. Dig. 5, pl. 9. This is *Pit v. Cholmondeley*. (See my notes *Dauphin v. Broom.*) Ch.R. 190, account between parties shall be taken from last balance only. 2 Atk. 252, *Willis v. Jernegan;* keeping account any length of time without an objection binds the party to whom it is sent.

*Vandyke,* for defendants, speaks of Bauduy's ratifying the commissions of 2½ on net proceeds over and over again. The conduct of plaintiff repeatedly negatives the idea now set up, and which never existed till he withdrew from this concern. The dispute came from Mr. Garesche; he first started the claim to 2½ on gross sales. See his deposition. The intention of the parties at the time of the agreement must govern the question. Their own construction is proof of the meaning of the agreement and what they understood by it, and of their intentions. What Duponceau has said is beside the case. He gives his opinion on a general question, and not to a case like this. The allowance to Bauduy was not as a commission for selling goods. It was for several services. He was not to be the seller.

Agreement, August 25, 1803, Art. 1, 2, (above), shows that this is not a commission on the sale of powder. He did not and could not sell. This 2½ was given for all the services to be performed by Mr. Bauduy, such as establishing agencies in the interior. He is paid his expenses, and then gets 2½ on the net proceeds. The propositions of Mr. Bauduy when he was about to relinquish his share in the concern prove that he considered himself entitled to 2½ on the net proceeds only. So they prove that the accounts were settled. As to extra interest; that is, charging him with money drawn from Garesche and Raviseer, he ought to be charged. This was the principle of keeping the accounts. Usurious interest. (After 1810, this depends on the contract. *Quaere.* Has the contract said that he shall not be charged with this interest though he gives up profits?) As to powder sold. The Powder Book does not give a correct account of sales. The powder sent out, just before the Peace, was estimated at a price exceeding by one half, the real sales, according to the return of sales, or invoice of such sales. Where is this account of sales? The sale books show that the powder sold to government was not an absolute sale, but was a re-manufacture, or a manufacture of the materials furnished by the government. (He is to have 5 per cent on powder re-manufactured, and on powder manufactured of materials which the company did not furnish, or purchase. See Agreement, July 1, 1805. Art. 2, above.)

As to private accounts, where they have been introduced and settled by Mr. du Pont and Mr. Bauduy, each consenting, no wrong is done to Mr. Bauduy. The court will not open the accounts on a mere technical objection. Mr. Bauduy assented to and ratified this charge. There are many entries not proper to have gone into partnership accounts, but no wrong being done, that can be no cause to set aside the account. It is not a strict rule of equity not to set off accounts in different rights; and the rule is not so strict at law. 2 Term 476, *Smith v. Barrow,* Where a partner or executor brings an action in his own right for money received after the death of the other partner, or testator, the defendant may set off whatever was due to him from the plaintiff. 6 Term 582. A debt due from plaintiff as surviving partner to the defendant may be set off against a debt due from defendant to the plaintiff in his own right. (*Vide* 5 Term 493, same point.) Willes 106 cited to same point. These cases show that in courts of law they have been extending this matter. (When the actions in Term were brought, the money was due from and to the respective parties in their own rights; and therefore they might well be set off. The judgments would be

rendered for the plaintiff in his own right, without noticing the deceased partner.) Mr. Bauduy has gotten the title to the land, and it would be inequitable to strike out the account for land, especially as he agreed to the charge. He has not been twice charged for this sum.

*Read, Sr.* for defendants. Mr. Bauduy was bookkeeper in 1806. The account stated by Raphael Duplanty was Mr. Bauduy's statement. His mind dictated it. The account thus stated was a settled account by such statement. This stated account is also found in Mr. Bauduy's possession, in his book produced here by him. The second settled account was in 1809, which strengthens settlement of 1806, that balance being carried into 1809. The year 1809 was the regular termination of the original article. In December, 1809, Mr. Duplanty was not bookkeeper, but he was the amanuensis of Mr. Bauduy who was bookkeeper. The Agreement, February 15, 1815 (above), sanctions all preceding settlements in relation to the concern of this company. Article 1, he sells all his interest and concern etc. This is evidence that affairs were here adjusted between them and Peter Bauduy. There existed with these parties no interest but the interest of 1810. This is conclusive evidence that all antecedent interest had concluded with the contract terminating December 1809. (Still how is Article 3 to be construed? There is a balance to be paid by or to him; and said Bauduy's account was to be settled.)

After 1815, Mr. Bauduy ceased to be interested in the profits which accrued after January 1, 1810; this by Agreement of 1815. All that was reserved was commission of 2½ per cent. By this Agreement, February 15, 1815, he ratified all the accounts or settlements to June 30, 1814. Mr. B.[19] never came into this concern as bookkeeper till 1813. All these settlements were in possession of Mr. Bauduy; he never objected to them. He sold no profits before December 31, 1809, because the account had been settled; and he had received profits. Mr. Bauduy's consent to these accounts concluded him. The private accounts of Bauduy and Du Pont are blended. It was always the course. His private account is introduced with Bauduy's consent. That he has so consented, see entry, September, 1804, of a balance of private accounts between him and Mr. E. I. du Pont. See bill of Thomas Bradun, and Brusier and Tissin. 3 Dall. 505, that by contract, a stock contract may be assignable; though not in law.

In Bauduy's Book he charges (p. 150) the company with his own private account with E. I. du Pont; that is, with a balance

---

[19] Mr. D. (Mr. Duplanty) seems here intended.

due to him from Du Pont. It was the understanding that it should be so. To exclude this charge of $1,000 would be to debar Du Pont forever of it, for Mr. du Pont has got a deed, and has not paid, nor given security for it. But the complaint in bill is that he is twice charged (which is not the fact). In his bill he does not except to first charge, but only to a double charge. Admits propriety of second charge. As to gun powder manufactured for the United States, Mr. Bauduy now cannot object to this charge. He knew the whole matter. He entered into the settlement with full knowledge, and thereby admitted that he was entitled to 5 per cent only, the raw materials being furnished by the United States. See Garesche's letter, No. 14, to E. I. du Pont. (What settlement is there spoken of? He returns the paper. *Quaere.* What paper?) This letter concludes Mr. Bauduy. It proves his assent to the 5 per cent on the powder and his assent to the settlement.

As to commission of 2½ per cent. This refers to sum which would be received on proceeds of sale of powder. The sum received from the sale would be the net sum. His commission must be on the proceeds, or on the sum received. The allowance of a commission on the gross sum, for powder sold at the factory, is not inconsistent with the allowance of 2½ on the net sales by agents. His commissions were on the money received.

As to usurious interest contained in the account after settled account. When he gave up his profits, he sold them for $60,000, but that did not exempt him from the charges. Instead of profits, he is paid for them, among other things by these $60,-000. The Agreement of 1815 (above) concludes him against impeaching the settlement. No. 13, letter of Mr. Bauduy, January 3, 1815. He recognizes the balance of July 1, 1815.

*McLane* for complainant. The case depends on facts, and not law. If the accounts are not stated accounts, they cannot stand in bar to an investigation. If they are stated, we may point out their errors. A stated account should be final and close the transactions to which they relate,—as when he is furnished with a final account, he takes it and makes no objection. But here is a partnership concern, which is a running account, the balance of one being transferred to another. There is no close, nor final settlement; none of the parties were bound by it as a settlement. (Could there be a settlement unless the accounts of all the parties had been settled, and the whole concern, or unless he had withdrawn and then they had liquidated the account with him?)

The Articles only look to a final liquidation when the concern ends. No regular books were kept till 1806. Mr. Bauduy had

made entries, and hence they say it was his duty to keep the books. But it was not his duty. No agreement contains such contract. Indeed he could not be considered as bookkeeper, when he is allowed to be absent. He was to take charge of the outdoor business, and never was, nor could be bookkeeper, from the nature and terms of his engagement. It is wonderful there was none till 1809. Mr. du Pont did not keep the books. From necessity Mr. Bauduy made general entries till 1806. Then came Mr. Duplanty; and Mr. du Pont says the books were in confusion! Mr. Duplanty sat down, not to settle accounts but to reduce the entries to proper form and regularity, yet they say that this statement of Duplanty in 1806 is a settlement. Accounts closed at the end of the year was no settlement, but to give an idea of their standing and general condition.

The members in Europe were not parties to any settlement. No accounts were transmitted to Europe till 1809. These accounts, it is said, were copied into Mr. Bauduy's books. This does not render them final. The transfer made no settlement. The books of the concern should have been settled. An individual may settle his accounts in [a] company, by merely settling his own account, for he has no interest in the account of any one of the company; not so, though, as to members or partners. Duplanty said this was kept as Mr. Bauduy's account current, kept to be sure to be seen and examined but not as a record of settlement. It was a copy kept merely for satisfaction of him and the company. Why was Mr. Bauduy confined to that book? Why was his account to be extracted from the company's books? Why should he not inspect the general books, as well as the other members. After the Philadelphia Agreement (above), they could not settle Mr. Bauduy's account till they got this book which he furnished in March, 1815 (see answer, above). The copy they got they made after they received the book. They had made no settlement. They got the book to make up the accounts. No settlement in 1809. No division of property, nor dividend of profits. They were not struck nor divided in 1809. See Duplanty's answer to third additional interrogatory.

Settlement of 1814. Fourth plea goes from 1810 to 1813, but no settlement for they guessed at the profits. No settlement subsequent to 1810, for they had to guess at the profits, and give a gross sum. There was no settlement in 1814, in the middle of the year. By the Articles, the settlement was to be made at the end of the year. This was merely a trial balance. See the letter of Mrs. de Pusy, 1814. She never could get a settlement. She wanted the accounts of the concern to be settled, to sell her shares.

We can at any rate surcharge and falsify. First, as to the commission of 2½ [per cent] on proceeds of sales. This depends on the terms of the agreement. Proceeds of sale is the value of the article in money. These are gross or net. If "proceeds" mean "net proceeds," why is the word "net" used? Mr. Duponceau gives the correct meaning. Victor du Pont is at variance with himself. Biderman states that *"net produit"* in French is used for "net proceeds." Victor du Pont says it is only used in writers on political economy, and not in commercial accounts. Duplanty uses in Ledger 10 the words *"net produit"*, in commercial transactions. Duplanty's testimony goes for nothing, because he comes here to support his own act, his own construction. He in making an entry used the expression, and gave the construction they contend for. The words must depend on the meaning of the party. Irenee du Pont uses sales as proceeds of sales (see his proposals). The words "sales" and "proceeds of sales" are used by the parties as the same thing. They say that Mr. Bauduy has given a construction to this agreement and that he should not now investigate it. It was the construction of Duplanty, and not of Bauduy. Duplanty gave the first construction. No book shows that Bauduy had ever calculated commissions. In 1806, when Duplanty first undertook to arrange these accounts, he calculated these commissions. Duplanty was bookkeeper, but Bauduy was not bound by his calculations. (Duplanty was bookkeeper of the parties, and not special agent of Bauduy and his act will not, if erroneous bind Bauduy.) Acquiescence in an erroneous account will not bind the party.

*Read* for defendants. Mr. McLane has called on us to show that this construction of commissions originated with any other but Duplanty. His, Duplanty's, answer to third additional interrogatory, so to the second additional interrogatory, shows that Mr. Bauduy assented.

*McLane.* Duplanty makes calculations, Bauduy none. He transferred statement of Mr. Bauduy and Bauduy copied accounts made by Duplanty, but there is no proof that Bauduy calculated commissions, or directed Duplanty to calculate them. Garesche states that he pointed out this error in 1814. Bauduy knew how the commissions should be calculated. Garesche pointed out the error, and then Bauduy called on them. Duplanty is author of the mistake. Bauduy is not bound by it. No one is bound who acts without a knowledge of his rights. They traded on an immense capital, greatly beyond the sum subscribed. Bauduy was answerable for this whole capital; and the commission is given as an indemnity for the risk he runs. Suppose a debtor fails, it increases Mr. Bauduy's risk. And suppose

all fail, where will Mr. Bauduy get his commissions? It is the indemnity proposed to him by the sale and not proceeds.

Second, as to powder manufactured for the United States. When the concern purchase the material, Mr. Bauduy is entitled to his commission. Did the company purchase these materials? See Callender Irvin's testimony. He shows that this was a contract for the purchase of powder. Answer to second interrogatory. He entered into a contract for half a million. He said nothing about furnishing materials. Where is the contract made with Irvin? The books show that this was not a contract for a manufacture from materials furnished by the United States. Ledger 10, first page, on side, is no account but a mere calculation of Victor du Pont. The Powder Book, it is said, contains mere nominal prices. This book was stated by Du Pont to show prices of powder when sent out of the manufactory. This will not bind him as to the agent, but the sales will. When he sells to an individual he is bound, as to W. Rice. He got 60 cents for powder sold to him. So when he sold to the War Department he got 60 cents. If that is not the price let him show it. When powder is made for materials furnished by others, the price of labor is shown in this book, and so when re-manufactured. Under date February 4, 1808, is a charge of powder manufactured out of materials furnished by the United States. So, April 13, 1813, when powder is sold the full price is shown. If government produced the materials, why not show the contract. Journal No. 7, July 11, 1814, p. 15 charge to United States for gun powder sent to arsenal, at $56 per cent. So, July 14, 1814, p. 216, for gun powder sent to the arsenal. So, fol. 217, 218,—they are all at $56 a hundred. Our commission is not charged on all the powder delivered to the United States. They only credit us for the money actually received. We had a right to commissions on the powder delivered to the United States, and yet we are not credited for them. We are entitled to the commissions though the money is not received. And so as to consignor. Bauduy has credit on powder delivered but on 20 cents only, instead of 56. This commission was given as an indemnity to protect us against loss.

As to usurious and extra interest. Mr. Bauduy renounced all profits after 1810, and he receives $60,000. Now this he is entitled to, clear of all loss. The $60,000 are in lieu of all profits. The item stood on account of profit and loss, and since February 15, 1815, it is transferred to Mr. Bauduy's account. This transfer shows that the accounts are not settled; for, if they were, how could this be transferred to Mr. Bauduy. All this interest is from 1810. They say that Mr. Bauduy was indebted to the con-

cern. They charge him with interest, and then with the extra interest. The usurious interest cannot be charged to Mr. Bauduy. An extra interest or discount goes to the account of profit and loss. There is no proof that Mr. Bauduy was privy to or assented to it. After allowing him $60,000 for his profits, can he be liable for losses? This interest is brought for the first time to Peter Bauduy's account, December 31, 1814, from account of profit and loss. Now they had no right to transfer this from the account of profit and loss.

The private account cannot be brought into this against Mr. Bauduy. The Philadelphia Agreement confines the settlement to the account of the company. We charge that Bauduy's own private account against Du Pont exceeds this charge of Du Pont against Bauduy. The books only private account of Du Pont with the concern; but the private account of the partners with one another are not to be brought into the account of the company. The mill seat has no relation to the affairs of the company. All these, they say, are sanctioned by Bauduy's letter of 1814. That letter was designed as a compromise only, mere proposition. The Agreement must speak for itself. The propositions cannot govern it. New plea that we were bound by rendering the accounts; yet in their pleas they go no further down than June, 1814. The accounts were rendered in 1815. They were rejected, and thereupon the bill was filed.

THE CHANCELLOR. There never was a settlement between all the members of this partnership. Even on January 1, 1810, there was no such liquidation of the accounts of each individual member, as to reduce to a certainty the true state of their interests. The sixth article of the Agreement made at Paris required that an inventory and valuation, at their actual value, of the real and personal estate and property of the establishment, should be made every year. And it was agreed that the surplus of such valuation, whenever it exceeded the amount of the funds, which were the first stock of the association, after deducting the interest payable on the shares, should be deemed as profit. And in the ninth article it was declared that the directory of the factory, and the agent of the House of Du Pont de Nemours, Father and Son and Co. should fix and determine each and every year, what proportion of the profits should, in consequence of the inventory, be divided among the shareholders; and that the division thereof should be made.

None of these acts were performed until January 1, 1810, or December 31, 1809. And, although no profits may have accrued

for several years, yet the inventory and valuation were essentially requisite according to the terms of the Agreement, without which the exact condition of the partnership could not be known; neither could the particular accounts of any one member be adjusted. It would not be sufficient to say that no dividends could be made because there were no profits, and therefore that the inventory and valuation were useless; for the parties, and especially the directory of the factory, and the agent of the House of Du Pont de Nemours, Father and Son and Co. were bound to make an annual estimate as aforesaid, and at least declare that there were no profits, and that no dividends could be made. The affairs of the establishment, and the inutility of making an inventory and valuation may excuse the omission, but the omission is a conclusive argument against the settlement, or stated account pleaded to have been made February 24, 1806.

How could Peter Bauduy's share of profits be ascertained before December 1809? He became a member of the association the 25th August, 1802, and from that time to December 31, 1809, there was no payment of profits to him, as profits, according to the original Articles of Agreement. All the money and other matter expended or employed by him, and all the charges against him, were mere charges and credits in account current, necessary to be kept that the amount might, on a settlement be set off against his account of profits, and the other emoluments arising to him on his union with the company. The charges against him for his seven shares of profits, on the first of January, 1810, are $10,324.79; and until that moment, neither he, nor Mr. du Pont, knew what his profits were; and consequently it was impossible that the first account pleaded as a stated or settled account could have been settled on February 24, 1806.

The next ascertainment of profits was made in June, 1814. Before that time, it necessarily follows, that the accounts pleaded to have been stated and settled December, 1810, and December, 1813, could not have been settled accounts, because the parties knew not the profits to which Mr. Bauduy was entitled. Besides, the transferring what is called the usurious interest, from the account of profit and loss, to Mr. Bauduy's account, since February 15, 1815, demonstrates clearly that the defendants did not deem these accounts to be settled and finally adjusted; for if [it] had been so, they could not have added one dot to them without the consent of Mr. Bauduy.

Additionally, the third article of the Agreement of 1815 strengthens and confirms the opinion which I have formed on this subject. The balance, on crediting Mr. Bauduy with $60,000,

was agreed to be paid, as it might turn out, within [——][20] months "from the time the said Peter's account with the concern is settled." What account? The whole of it. It is evident from this last Agreement, that the whole was considered as unsettled, and that it was to pass the examination of the parties. If any account between the parties had ever been settled, it is curious that Mr. du Pont and Mr. Bauduy, the two most interested persons in such a settlement, never personally made it, nor had any discussion on the occasion.

The pleas must be overruled.[21]

---

Court of Chancery. New Castle.
April 14, 1818.

*Affidavit of R. Bauduy.*

Peter Bauduy being sworn saith that previously to the execution of an Article of Agreement by which this deponent said complainant agreed to withdraw from the concern of E. I. du Pont de Nemours and Co., executed at Philadelphia February 15, 1815, he, this deponent held an instrument of writing duly executed by the said E. I. du Pont and wife conveying to this deponent a title in his proportional share of the real estate of the said concern on the Brandywine and held in the name of E. I. du Pont. That, according to the tenor and effect of the 5th article of said agreement executed at Philadelphia as aforesaid, the said deponent became bound to convey and transfer to the said concern his rights title, and interest in and to the said real estate, and in part performance of the said Article of Agreement this deponent actually did cause to be delivered to the said E. I. du Pont the said instrument of writing from E. I. du Pont and wife to this deponent, making no other conveyance or transfer relating to the said real estate.

Sworn to and signed by *Peter Bauduy* in open court, April 11, 1818.

Whereupon, without an objection on the part of Mr. du Pont, a rule was laid on Mr. du Pont to show cause why he should not bring into this court the said instrument of writing executed by said E. I. du Pont and wife to be deposited in this court until

---

[20] Blank in manuscript.

[21] At this point, *Ridgely's Notebook I, 227,* the account of this case is interrupted; it is resumed at *II, 88.*

the determination of the suit in Chancery, Bauduy against Du Pont and others.

Now this 14th April, *G. Read Jr.,* and *McLane* for Bauduy, and *H. M. Ridgely* for Mr. du Pont argue the rule.

*G. Read Jr.,* for Bauduy, says the rule is reasonable, that that court has the power to order this paper to be brought into court. That if Mr. du Pont were to die, as this paper is not recorded, he, Mr. Bauduy might be compelled to file a bill in chancery.

*H. M. Ridgely* and *G. Read,* for Du Pont, contend that this paper belongs to defendant, that this paper is defendant's own private paper, and was placed in defendant's hands by Mr. Bauduy, according to his own private agreement. If Mr. du Pont becomes indebted, or it be decreed to pay anything to Mr. Bauduy, that can make no necessity that this deed should be returned, or brought into this court. There is no special reason for bringing this paper into this court. In this collateral manner, they cannot take from our hands a paper not necessary to the adjudication of the cause, to the ascertaining the rights of the parties.

*McLane* for Bauduy. The object of the motion is to bring this paper into court, and thereby place the parties precisely in the situation they were when this article was made. Mr. du Pont has not paid the money nor accounted, and has [not] paid the consideration for this paper, or the title of Mr. Bauduy.

Rule discharged.[22]

---

Court of Chancery. New Castle.

August 28, 1818.

*McLane* and *Read, Jr.,* for complainant.

*Read, Rodney, Vandyke* and *Ridgely* for defendants.

At this stage, just as we were about to proceed in the hearing of this cause, it was proposed that the case should be continued until Monday, the 31st instant, on account of the illness of a child of Mr. McLane, counsel for the complainant, and all the parties and their counsel consenting, the cause is accordingly postponed until Monday next.[23]

---

[22] At this point, *Ridgely's Notebook II, 88,* the account of this case is interrupted; it is resumed at *276.*

[23] At this point, *Ridgely's Notebook II, 276,* the account of this case is interrupted; it is resumed at *278.*

August 31, 1818.

The further answer.

That though according to the Agreement of April 21, 1801 (see [——])[24], it was contemplated to erect the necessary buildings in that year and the beginning of the next, yet it could not be done. The powder manufactory did not go into operation till beginning of 1804, and complainant knew it could not be put into operation.

That Schedules marked *A*, No. 4; *A*, No. 5; *A*, No. 6; *A*, No. 7; *A*, No. 8; *A*, No. 9; *A*, No. 10; *A*, No. 11; *A*, No. 12; *A*, No. 13; *A*, No. 14,—accompanying this answer contain true accounts of the sale of powder, and of the manufacture, and re-manufacture of all powder made etc. by E. I. du Pont and Co. exclusive of their agents, and also all receipts of sales, and for the manufacture and re-manufacture for the years from 1804 to 1814 both inclusive. And the Schedule *B* accounts of the sales of powder made by agents, the quantity sold, the gross amount of sales, the charges and the net proceeds actually [received] by E. I. du Pont and Co. from 1804 to 1814 both inclusive. That the Schedules *A*, and *B* show a fair account of all the business of E. I. du Pont and Co., and powder made, sold, etc. from April 21, 1801 to 1815, contracts with the United States and others. Said Schedules show the commissions of complainant under Agreements, August 25, 1802, [——][25] and July 1, 1805, [——][26] even if complainant had fulfilled his part. Schedule *C* exhibits at one view all the said commissions, and the annual and aggregate amount. Schedule *D* gives an account of profits from April 21, 1801 to January 1, 1810. *D*, 2 and *D*, 3, explanatory schedules. Schedules *E*, 2; *E*, 3; *E*, 4; *E*, 5; *E*, 6; *E*, 7; *E*, 8; *E*, 9; *E*, 10; *E*, 11; *E*, 12; *E*, 13; *E*, 14;—contain true account between E. I. du Pont and Co. and complainant from the time complainant became a partner, on August 25, 1802, till December 31, 1814, and show balance due from complainant every year.

That by Agreement, April 21, 1801, complainant became entitled to interest at 6 per cent *per annum* on the four shares of stock which he held after paying $8,000, the amount of said shares; and complainant is credited in the Schedule *E* at the end of every year with interest on said four shares, from the time he paid until 1814; that previous to his payment of said four shares, and after he is credited with interest on all sums of money

24 Blank in manuscript.
25 Blank in manuscript.
26 Blank in manuscript.

by him advanced, from the advances till the end of the year in which they were advanced, and the interest or balance of interest standing against said Company is carried to complainant's credit in the account of the next year and made principal.

That by Agreement of August 25, 1802 [——],[27] complainant is allowed commission of 2½ per cent on the proceeds of sale of powder made, and three shares of profits, exclusive of his profits on his four shares of stock, in consideration of his engagement of activity, and time from May 1 till December 1 in every year. Defendant avers that complainant did not faithfully perform his engagement, yet complainant is fully credited with 2½ per cent on the proceeds of the sale of powder from 1804 to 1814, both inclusive.

And by Agreement, July 1, 1805 [——],[28] complainant is allowed as an equivalent to the 2½ per cent on the proceeds of sales of powder, a commission of 5 per cent on money actually received for re-manufactured powder and other jobs where no materials were to be purchased. Defendant is fully credited with said 5 per cent. And each year's commission, at 2½ on sales of powder, and 5 per cent on money received for the re-manufacture of powder, and other jobs, when no materials were purchased will be seen in Schedules A and B and in one view in Schedule C.

And by Agreement, August 25, 1802 [——],[29] complainant is allowed three shares of profits above the profits on his four shares of stock, notwithstanding he did not perform his engagements.

And by Agreement, July 1, 1805 [——],[30] a gratuity of $1,000 allowed to complainant prior to any dividend being struck. No profits divided, nor dividend made before the close of 1809. Schedule D shows profits of the concern from the establishment till December 31, 1809, after deducting said $1,000, and contains the share complainant was entitled to in said profits, for his four shares of stock, and three shares of profits.

By Agreement of February [——],[31] 1815 [——],[32] complainant sold to the other partners his shares etc. etc. in said manufactory and in the real estate, it being understood that complainant renounced forever, from January 1, 1815, the commissions granted by Agreement of July 1, 1805, and profits on his

[27] Blank in manuscript.
[28] Blank in manuscript.
[29] Blank in manuscript.
[30] Blank in manuscript.
[31] Blank in manuscript.
[32] Blank in manuscript.

stock, and his three shares of profits from January 1, 1810. And complainant allowed $60,000 in addition to his 2½ commission to January 1, 1815, and they agreed to pay complainant $15,00[0] yearly for four years, first on January 1, 1816, and last on January 1, 1819; but said payments to cease in case said manufactories or either of them should be burned, or destroyed by the enemy in the course of the four years mentioned.

That agreeably to Agreement of July 21, 1805 and February [——],[33] 1815, complainant is credited in the Schedules *E*:

First, with interest at 6 per cent every year, on his four shares of stock from his payment of them to January 1, 1815.

Second, with the gratuity of $1,000 granted by Agreement, July, 1805, as of date December 31, 1809, with interest.

Third, with his profits on his four shares and his three profit shares from April 21, 1801 to January 1, 1810.

Fourth, with commissions 2½ per cent on proceeds of sale of powder, from first making powder to January 1, 1815, the said commission being allowed on the gross sales made by company itself, and on the net sales made by agents; or in other words 2½ per cent are allowed on every dollar received by the company on account of or as the proceeds of the sale of powder. Complainant entitled to no more under Agreement, August 25, 1802. That during the partnership complainant always [calculated] his commissions in same manner. Complainant kept the books and always so stated his commissions. Complainant did not perform his duty.

Fifth, complainant is credited in Schedules yearly with 5 per cent on money received for powder re-manufactured and other jobs, no materials being purchased, as by Agreement, July 1, 1805, on the two contracts with the United States; the materials were furnished by the United States and not purchased by company. Complainant credited 5 per cent on the money received. Contracts with United States, October, 1812 and February 1813; first for 200,000 lbs., last for 500,000. In both the United States furnished the materials; powder made at certain price, as by Schedule *F* and letter *G*, certified by Commissary General of United States.

Lastly, in Schedules *E* with money and articles by him advanced etc. from beginning till January 1, 1815.

---

[33] Blank in manuscript.

That complainant answerable for all money advanced to him, and interest thereon. Complainant chargeable with all money advanced to Garesche and Raviseer, agent of Du Pont and Co. with interest. Course to charge interest and credit it, in accounts with members. That, during years from January 1, 1810 to December 31, 1814, complainant and defendant were severally indebted to the company above their shares of profits, for money drawn from company for their private uses respectively.

That during said years the company needed the money so owing from defendant and complainant. Money necessary, could not be had at common interest, it was determined to borrow at extraordinary interest or discount, and money was so obtained for the company. This extraordinary interest amounted to $3,582.94, with consent of complainant and his advice. Complainant a party to the notes etc. That at meeting of the members and representatives of members, complainant and defendant both present, the books of company were inspected. It was insisted on by other persons of said company that said extra interest should not be borne by said company; no fair loss, not occasioned by the acts of the company, and that complainant and this defendant should pay and bear it in proportion to their debts. Complainant and defendant did not object. Accounts were corrected and complainant and defendant charged in proportion to their debts. Proportion of complainant amounted to $2,050.14 as by Schedule *H*. Such interest, no loss to company, incurred by complainant and defendant. And in Schedule *E*, 14, complainant is charged with said $2,050.14 under date December 31, 1814; and on executing Agreement of February, 1815, complainant knew he was charged with said interest, [but made] no objection.

That complainant on December 31, 1814, justly indebted to the company in $67,268.53. That between January 1, 1815 and February 15, same year, complainant drew and received money to his own private use, for which he is accountable, as by Schedule *I, K,* which sums, added to the balance appearing in Schedule *E*, 14, with interest to February 15, 1815,—make $68,959.80 due from complainant; from which is to be deducted $60,000 allowed to complainant by Agreement of February, 1815, and $1,773.45 commissions to complainant on money outstanding 1814, and collected in 1815, which is credited as of February 15, 1815, which said two last mentioned sums amounting to $61,773.45 being deducted from $68,959.80 leaves, on February 15, 1815, due from complainant to said company $7,186.35.

That on March 19, 1818, the Eleutherian Powder Manufactory was burned, whereby the company ceased to be liable to complainant for the last years' annuity granted by Agreement of February, 1815. From said balance of $7,186.35 are to be deducted the three years' annuities due January 1, 1816, 1817, and 1818, which leaves a balance of $3,729.81 due from complainant January 1, 1818, as by Schedule *I, K*.

That since this suit was brought, on March 11, 1817, complainant commenced an action of covenant in Supreme Court against this defendant and J. Anthony Biderman, on the Articles of Agreement of February [——],[34] 1815, to compel the execution of which Articles this suit purports also to be brought and the said action is now depending in Supreme Court. Defendant submits whether complainant shall be permitted to harass defendants by two suits, at same time, for same cause of action, etc.

That in Schedules *E* the accounts of this defendant in his individual right are not included, nor in any of the schedules, but defendant insists that complainant is indebted to him for the purchase money of land, mill seats and water rights in a balance of $3,212.50 with interest from July 4, 1814, as by Schedule *L*. That Bauduy, Garesche and Co. is indebted to E. I. du Pont de Nemours and Co. in $1,315.90 with interest from April 30, 1815, as by Schedule *M*. And defendant submits whether the two last mentioned balances, that is balance due from complainant to this defendant, and the balance due from Bauduy, Garesche and Co. to E. I. du Pont and Co. ought not to be carried to the debit of said complainant in the settlement of the accounts between him and E. I. du Pont and Co. Defendant denies [——].[35]

*Read, Jr.,* reads the exceptions taken to the accounts filed by defendants.

Depositions of witnesses taken on the part of the defendants.

Callender Irvin. The testimony of Callender Irvin is objected [to], because his testimony goes to give evidence of a written contract made between United States by him, and E. I. du Pont de Nemours and Co., without any proof of the loss of such paper; which paper Irvin says, when he was examined in this cause, he saw in possession of defendants. That the contract must speak for itself.

*H. M. Ridgely* for Du Pont. Irvin's testimony goes to show what was done under the contract.

---

[34] Blank in manuscript.
[35] Blank in manuscript.

THE CHANCELLOR. Irvin can give no evidence of the contents of the paper, or of its meaning. He may testify as to any facts done or not done. The Court, though, must judge of the paper.

This deposition was read saving all just exceptions to it.

[Further depositions for defendants:] William Rogers, manufacturer of gunpowder, 45 years; William Read, 50 years; Archibald McCall, 50 years; Bernard Dahlgren, 50 years; Daniel Lemoth, 35 years; Paul Beck, 57 years; Augustin Bousquet, 54 years (see answer to 12th interrogatory); Robert Hamilton, 60 years; John Gordon, 36 years; William Murphy, 38 years; William Boyd, 38 years; Jacob File, 40 years; John Weir, 34 years; William Martin, 47 years; Victor du Pont, 50 years; Raphael Duplanty, 40 years.

Depositions of witnesses taken on the part of the complainant: original depositions, before read; E. M. Garesche; Peter Stephen Duponceau; Paul Beck, Jr.; John Leaming. Depositions of witnesses for defendant read heretofore in this cause: Victor du Pont; Caleb Kirk; Anthony Gerard.

Raphael Duplanty['s testimony offered].

To this witness *McLane,* for complainant, excepted, that Duplanty is interested in this cause, as the accounts are now filed. By the additional answer and accounts filed, it appears that Duplanty is interested. The salary paid to Duplanty is charged to Mr. Bauduy. He is not competent to prove this charge one way or another. The book read before, was read as act of Bauduy, because he was clerk of Bauduy. If Duplanty was clerk of Bauduy, no charge in account; but if Duplanty is clerk of company, he is interested. His interest now only appears.

*H. M. Ridgely* for defendant. Duplanty has no interest. He swears so. Bauduy in account is charged for $[——] [36] for services of Duplanty, but Duplanty has been paid. He was bookkeeper of the company but was employed by Bauduy and Bauduy promised to pay him $500 a year. By contract of 1802, Bauduy was to attend to outdoor business, and to settle with others. He then must keep books. In 1810 he, Duplanty, became regular bookkeeper. In 1812 he kept books of woolen factory and Bauduy agreed to pay the $500 as bookkeeper for powder factory. He has been paid.

THE CHANCELLOR. Duplanty has no interest. He cannot be affected by the event of the cause. Let who will pay Duplanty, it cannot affect this cause.

---

[36] Blank in manuscript.

Raphael Duplanty, his testimony read.

James Anthony Biderman. The letters from No. 1 to No. 14, in evidence. Same as read before. See Notes, above. No. 16 A A, annexed to Delaware commission returned this term. An account of Peter Bauduy with Robert Hamilton. All the Agreements (noted above) in evidence. No. 21 identified by the signature and certificate of commissioners in handwriting of complainant annexed to first Delaware commission. Notes and checks annexed to commissions, some to first and some to second Delaware commission, and commissions to Philadelphia. Papers proved. These relate to the extra interest.

*Mr. Vandyke* reads commission heretofore executed in Philadelphia. Same depositions read [as those read] September [1], 1817 (See Notes, above): Francis L. Cox; Archibald McCall; Callender Irvin; Thomas Shivers of Wilmington; Samuel Archer of City of Philadelphia; Jeremiah Warden of Philadelphia.

---

The following are the exceptions filed by complainants to the accounts filed by the defendants by order of the Chancellor.

*First* [*exception*]. For that the complainant is not credited as he ought to have been with the sum of $1,000 stipulated to be paid to him as a compensation by the first Article of Agreement of 1805, previously to any share of profit divided, inasmuch as the said sum of $1,000 ought to have been carried to his credit on December 31, 1805, instead of December 31, 1809. (Notes 1817, p. 185.)

*McLane.* By first Article, April 21, 1801 (Notes 1817, p. 181), article 6, division of profits was to be made. After our Agreement the profits should have been taken December, 1805, and then we should have been allowed the $1,000.

*Twelfth exception.* For that the sum of $1,000 is not credited to the complainant according to the first article of the Agreement of July 1, 1805.

*McLane,* for complainant, contends that there should have been a settlement annually, and that each year before profits were divided, the complainant should be paid $1,000, thus he should have had $1,000 annually; and then annually the profits should have been divided, so that under twelfth exception $1,000 is claimed annually, and first on December 31, 1805.

*Read.* The party must be confined to his bill. He has not charged this matter in the bill.

*Read, Jr.* The whole accounts are open. The accounts are open generally. We are not confined to surcharge and falsify. In the further answer, they have filed a new account and have opened the matter. Everything is open. The burden of proof is thrown on defendant. The order to account was not to confine to objections taken in the bill. We are trying the accounts filed in this court, and now read and for first time. The prayer of our bill is for general account. Under this bill, we could investigate all the matters under the agreement. The pleas were overruled, and we now can have a specific execution of the Agreement.

THE CHANCELLOR. In overruling the pleas, the design was to make a settlement according to the Articles of Agreement between the parties. The whole matter is open, according to the case made by the complainant in his bill. But this Court cannot decree to the plaintiff more than he claims in his bill, whatever he may prove. 9 Cranch 25. In the bill there is no claim of the $1,000 to be paid annually; and in the specific objections in the bill, to the accounts charged against the complainant, it is not mentioned. Therefore the complainant cannot now allege in the exceptions to the accounts exhibited to this Court "that the sum of $1,000 is not credited to the complainant according to the first article of the Agreement of July 1, 1805." According to that Agreement the complainant is not entitled to $1,000 annually from December 31, 1805. The first article of the Agreement of July 1, 1805, in this particular, has no reference to the sixth article of the original agreement of April 21, 1801. The plain meaning of it is that the complainant should have a single $1,000 deducted and paid to him, before any division of profits should be made. It would be a very forced construction to refer it to the Agreement of April 1801; and contrary to its clear intention. If the parties had designed that these $1,000 should be paid annually, it would have been so expressed, or there would have been a plain and manifest implication; but there is no such thing. And the bill, answer, accounts, and acts of the parties antecedent to these exceptions demonstrate that the parties heretofore understood this matter as I now express myself. As to the time of calculating interest on these $1,000, it seems to me that there was an acquiescence in Mr. Bauduy in the delay in ascertaining these profits; and I do not see the justice of charging interest on this sum, before December 31, 1809.

The first and twelfth exceptions overruled.

*Second exception.* For that the division of profits founded upon the inventory etc. made the 31st December, A. D.

1809, is erroneous inasmuch as the said inventory etc. is not full and complete, particularly because it does not comprehend in the aggregate of profit to be divided an account or estimate of wood part of the property of the concern appropriated by E. I. du Pont, one of the defendants, to his individual uses from the year 1804 to the time of said division, amounting to at least the sum of $1,200, nor does it embrace the rent or value of the land of the real estate of the said concern occupied by the said E. I. du Pont, and worked by the labor of the persons hired by the said concern, the proceeds of the said land and labor being in like manner appropriated by the said E. I. du Pont to his individual benefit, amounting at least, for the same period to the sum of $1,800.

*Read, Jr.* Mos. 296, *Rodney v. Hare.* Plaintiff having assigned 150 errors on five stated accounts, order made for him to pick out those he would insist [on] and consent to waive the rest, if he should be of opinion they were not errors; if he thought them errors, he would either open the accounts or give him leave to surcharge and falsify. 1 Sch. and Lef. 192, when account has been settled, and either signed or a security given, the court will not open it, unless the whole transaction appear fraudulent, upon evidence founded on a bill suggesting fraud and specifying errors. 14 Ves.Jr. 578, to a bill for an account a settled account was suggested by the answer, but not proved; liberty given to surcharge and falsify, if the master should find any settled account. Bill impeaching an account to have liberty to surcharge and falsify must lay a ground by alleging some specific error. 1 Madd.Ch. 82, bill filed to impeach a settled account; specific errors must be shown.

*Rodney* for defendants.

*Read.* This matter is not embraced by the bill. The decree excludes every matter but what is made the subject of the bill of complaint. This case will stand on the former decree; and cannot go beyond that decree. The gravamen in the bill is that fair accounts have not been rendered of the manufacturing of gun powder and the profits. This involves the accounts of that manufacture. This is the object in the bill. The second exception is that an estimate of wood appropriated by Du Pont to his own use is not made in account of profits. This was a tort in Du Pont, and is beside the subject of account. It forms no part of the bill and is excluded by the bill. Neither is rent of land, and work or labor of hands, embraced by the bill, or decree. It is a distinct subject from the manufactory. The former decree over-

ruling the pleas of stated accounts confines the accounts to be taken to the concern of the company mentioned in the bill of complaint. The concern of the company relates to the manufactory of gun powder; the matter in the bill of complaint touches the manufactory of gun powder only.

*Read, Jr.,* for complainant. In bill praying account and answer, two orders only: one, to surcharge and falsify; second order is a decree for an open account. If this not an order to surcharge and falsify, we are not confined to the specific errors alleged in the bill. If this is open account we are not confined to the errors charged. The complaint here consisted of a number of items. Bill framed so if not getting general account he might surcharge and falsify. One object was that this was open account, or if that did not prevail then to surcharge and falsify. By overruling these pleas, it was determined that there was no stated account, and this is a decree for general account. Pleas of stated accounts overruled. Accounts then open accounts, for if they are not stated and settled, then they are open accounts. This is a decree for an open account; not necessary that the errors should be specifically enumerated in the bill. The matter of this exception is embraced in one bill. We state what includes the subject matter of this exception. We state Agreements; that they have not complied with Agreements; that accounts are incorrect; and larger balance due to us, than that found in accounts. We state the accounts erroneous, but more especially in the matters stated. If bill alleges there is a balance due, of what is that balance made up? Court decrees accounts of profits. You state profits, we say your accounts of profits erroneous, consequently you have not given true accounts of profits. The subject matter of exception they say is no part of concern. No part! How was the land obtained? From funds of concern. He holds as partner of concern. He was paid by a salary; he had no exclusive right to wood. All this shows that it is a matter belonging to the bill, for it belongs to the concern.

THE CHANCELLOR. I would most cheerfully retract any error which I may have committed, if I could be convinced of such error. I have no desire to persist in wrong, I have no pride of opinion; for I am sensible of my own fallibility, and how necessary it is to consider, and reconsider cases brought into this court, and especially such as are decided without much time for examination, and reflection. My great desire is to do justice.

With this leading motive, in considering the question very ably argued this morning, I am constrained to say that the second exception must be overruled. The decree made last Sep-

tember must be our guide so far as it goes, in taking this account. Then the pleas were disallowed, and the defendants were order[ed] to put in further answer.

"And to set forth and discover a full, just, true, particular and fair account of all the business done by, or on behalf of the concern of Eleuthere Irenee du Pont de Nemours and Company, mentioned in the bill of complaint, from the date of the Agreement entered into at Paris, up to the first day of January, A. D. 1815, comprehending as well all contracts made with the Government of the United States as with other persons; and also a full, fair, particular, true, and just account of all profits made by or on behalf of the said concern of E. I. du Pont de Nemours and Company, from the date of the Agreement aforesaid, executed at Paris, up to the first day of January, A. D. 1810; and also a full, fair, particular, just, and true account of all powder manufactured and sold or delivered, or re-manufactured, by or on account of the said concern; and the prices and amount of the actual sales and the proceeds thereof, whether sold by the said concern, or any member thereof; or by any other person or persons on account of the said concern, as also the price for the re-manufacture and manufacture from the date of the aforesaid articles executed at Paris, up to the first day of January, A. D. 1815."

Now, according to this decree, the account to be rendered of all profits made by or on behalf of the said concern could relate to no other profits than the manufacturing of gun powder according to the several Articles of Agreement made between the parties; that was the subject of the Agreements; the complaint related to the manufacture of gun powder only, and things incident to it; and the decree unquestionably had in view gun powder only as the source of profits. The "profits made by or on behalf of the said concern" had no reference to any other profits than those arising from gun powder.

If this is the correct understanding of the decree, and I believe it is, how could the defendants file any account touching the firewood, the rent of the land, and the labor of the workmen? The decree comprehended no such thing; and certainly the defendant, indeed both parties, must be held to that. If there is any error, it is in the decree not being sufficiently comprehensive; but considering the bill, the pleas, and the argument at the time of making that decree, it could not have been, and was not foreseen, that this firewood, rent and labor of the workmen would have been considered as the profits of this manufacturing company, and to be accounted for under that decree.

*Third exception.* That the commission secured to the complainant by the several Articles of Agreement between him and the respective members of the said concern, is not by the accounts allowed, and duly accounted for.

*Fourth [exception].* For that the said complainant is not credited with the true amount of commissions to which he is entitled inasmuch as his commission is allowed not upon the sales, but upon the sums alleged to have been actually received, deducting first all expenses.

*Fifth [exception].* For that all losses are deducted from the sums upon which the said commission is allowed.

These three exceptions are submitted without argument. This submission was afterwards retracted.

*Read, Jr.* As to fourth exception. Complainant is allowed his commissions on the net proceeds of sales, and not on proceeds. He is entitled to commission on amount of sales, and not on the sales clear of expenses and charges. Plaintiff's demand arises out of the Agreement [at Wilmington], August 25, 1802 (Notes, above). Fourth article, Mr. Duponceau's translation:

> As an indemnity for the trouble and care which Peter Bauduy covenants to take for the service of the factory, and also for the credit which he will contribute to facilitate at the Bank, in case of need, the three shares of profits, left without appropriation, by the seventh article of the Articles of Partnership, will be allowed to him, and in addition to it, a commission of 2½ per cent upon the proceeds of the sales of powder manufactured in said factory.

The original proposition made by Bauduy to Du Pont when he first proposed to enter as a partner, he stated, there shall be allowed to me a commission of 2½ per cent upon the sales. Mr. du Pont replied, that he left it to himself to reduce a little 2½ per cent on the sales ([Notes] 1817, p. 185). New York Agreement, July 1, 1805, second article: there it speaks of 2½ per cent which have been allowed to him on all sales (above). Agreement [of] February, 1815, third article: there it says a commission of 2½ per cent on all sales. The different Articles of Agreement give as 2½ per cent on all sales, or in other words upon the proceeds of sales. He is entitled to 2½ upon the actual amount of money made from sales. Proceeds is the consequence, the effect. Proceeds of sale is amount of money for which property sold; it carries no qualification. To restrain, it must be qualified by some word which alters its general mean-

ing. They might have used the word "net" to qualify the term "proceeds of sales." Duponceau says it means gross amount.

Back to 9th interrogatory. Says, if Duponceau's translation is correct, means gross proceeds and is the opposite of net proceeds. Costs, charges and expenses are always deducted with the commission. Duplanty contradicts himself. In book he uses net proceeds, net amount. To 12th interrogatory he says the commission varied at different times: 2½ when Bauduy sold; 2½ on net proceeds when others sold. Proceeds of sales means same thing in all articles.

Victor du Pont.

*H. M. Ridgely* for defendants. By article four of [——],[37] see Duponceau's translation (immediately above), Bauduy is credited with 2½ per cent on all the money received by company. Proceeds cannot be received on money lost. If they meant to give him commission on amount of sales, they would have said so, and not have used the words proceeds. The propositions of Bauduy and Du Pont show they meant commissions should be on amount of sales. The Agreements must be construed according to Agreement of 1802. This commission is allowed for particular services, not as a commission merchant. A commission merchant would be allowed only on sales after expenses were deducted.

To 12th interrogatory all the answers are given on this subject. Francis S. Cox, proceeds of sale means same as net proceeds. Archibald McCall, proceeds of sales means after all charges are deducted. Thomas Shivers, amount of sales means gross amount, proceeds of sales means net proceeds. Samuel Archer, same. Jeremiah Warden, same in substance.

To Philadelphia commission to this term. 2nd interrogatory. William Rogers agrees with the others. William Read, amount of sales, proceeds of sales, amount after deducting all charges. Archibald McCall, commission on proceeds, net amount. Bernard Dalgkil. Daniel Lamoth, proceeds, product after deducting charges. Paul Beck, same in substance. 3rd interrogatory. Mr. Bousquet, proceeds mean net amount.

Mr. Bauduy understood the term as we do. He made entries accordingly, and never objected till about bringing the suit. To last additional interrogatory, Raphael Duplanty, says complainant furnished items of account and calculated his commissions 2½ per cent on net proceeds of sales made by agents. In all Bauduy's statements he charges 2½ on net amount. No. 14, 1

---

37 Blank in manuscript.

Del.Com.[38]  Letter of Garesche states there would be no difficulty on the subject, accounts stated at 2½ on net amount.

Mr. Bauduy was an intermediate agent.  He settled with others, and can only be entitled to the money received from agents. The witnesses lay down that a settling agent receives commission on money only which he receives from selling agents.  Archibald McCall says an agent employed to settle account of selling agent has no right to commission, except on money he receives.  William Read, commission on net amount made by a sale agent.  Mr. Lamoth, same.  Bauduy is not credited with commissions on money lost.  A commission merchant has money on debts lost.  He is to receive commissions on proceeds, money lost is not proceeds, and he is not entitled to commissions on losses.  Bauduy so understood the Agreement.  He made entries accordingly.  McCall to 8th interrogatory says, in this case, commission was to be charged on the collections made. McCall is strengthened by every paper and book of the company.

The 6th, 7th, 8th, 9th, 10th, 11th, 13th, 14th, 15th and 16th exceptions are as follow.  The other exceptions are to be seen on the preceding pages.

> *Sixth* [*exception*].  For that the said commission is not allowed upon the sales made to the United States in the years eighteen hundred and thirteen and eighteen hundred and fourteen.

> *Seventh* [*exception*].  For that it is untruly stated that the contracts for the supply of powder to the said United States in 1813 and 1814 were contracts for the manufacture, at a certain price of materials furnished at a certain price, when in fact the materials were purchased from and the powder sold to the United States.

> *Eighth* [*exception*].  For that the sum of two thousand and fifty dollars, alleged to have been paid by the said concern as a part of usurious interest ought not to be charged against the complainant inasmuch as he is already charged with legal interest, and because it enters properly into the general account of profit and loss, with which account the complainant had ceased to have any connection by the agreement of eighteen hundred and fifteen.

> *Ninth* [*exception*].  For that the complainant is charged with the annual sum of five hundred dollars as paid on his

---

[38] Presumably, "No. 14, first Delaware commission [for interrogatories issued in this case]."

account to R. Duplanty with which sum he is not on any principle chargeable.

*Tenth* [*exception*]. For that the complainant is charged with the two several sums of one hundred and fifty seven dollars twenty two cents, and one hundred eighty six dollars, which, if ever received by him, have long since been paid over.

*Eleventh* [*exception*]. For that the account between the concern and the United States is erroneously stated, and the particulars thereof not made out according to the contracts between the said United States and the said concern.

*Thirteenth* [*exception*]. For that it is attempted to blend with the said account other matters of account not properly chargeable therein, particularly E. I. du Pont's individual account, and the account of the concern with Bauduy, Garesche and Co., of which last firm E. I. du Pont is himself a member.

*Fourteenth* [*exception*]. For that the annuity secured to the complainant by the Agreement of February, 1815, is not credited up to the time of rendering the account, and because it is untruly stated to cease by the explosion of a part of the works.

*Fifteenth* [*exception*]. For that the said account is unsupported by legal proofs of its correctness.

*Sixteenth* [*exception*]. For that a greater quantity of powder was sold by the said concern and for a greater sum than is accounted for by said defendants.

---

September 2. This case was postponed this day on account of the indisposition of the Chancellor. The counsel for the complainant had to reply and conclude the argument to the third, fourth, and fifth exceptions; other than this defendants counsel were to be allowed to read some authorities on the meaning of the terms, the "proceeds of sales."

---

September 3. This cause is continued to the next term, on account of the sickness of Mr. McLane's child. The first, twelfth, and second exceptions have been decided and are not to be reargued, so that after hearing the authorities to be pro-

duced by the defendants' counsel, to the third, fourth and fifth exceptions, the counsel of complainant is to reply; and then we proceed on the exceptions which have not this term been spoken to. The contract between the United States and Du Pont and Co. is now filed, and considered as in evidence.

Now, before we adjourn, the counsel for complainant and defendant will be allowed to take up the third, fourth, and fifth exceptions, *de novo,* and argue them as they please.

The Chancellor was also too sick to go on with the business.[39]

---

Court of Chancery. New Castle.

April 13, 1819.

*Mr. Rodney* began the reply to the arguments of complainant's counsel, on the third, fourth, and fifth exceptions. As to "proceeds of sale," the difficulty arises from the translation. *"Produit,"* the French word, may be properly translated "produce" or "proceeds" which are synonymous with net proceeds. The company had employed agents to sell, and the object of the article was to give a commission on the sums actually received after deducting expenses. If they had intended to give commission on the gross sales they would have said amount of sales. 1 Posthlewait's Dictionary, title "Account." By this, "net [40] proceeds" same as "produce." Ash's Dictionary. "Net," obsolete. Johnson's Dictionary, "Proceeds," same as "produce"; and so Walker and Ash.

Commissions to agent or factor unlike this. Factor is personally responsible for every sale he makes, that purchaser was solvent, and ordinarily might be trusted. Factor must be very circumspect. He cannot sell below market price. This high responsibility is the reason for extraordinary commissions to factor. This is the case of a partner, who claims commission on produce, where commission may have been paid to factor, and sale made and debt lost, and yet though the company receives nothing, he claims his $2\frac{1}{2}$ per cent. Nothing received, expenses incurred in a sale, and yet complainant seeks for commission. Bauduy has no responsibility, expense, or trouble on sales; and yet he demands commissions on gross amounts. The parties

---

[39] At this point, *Ridgely's Notebook II, 292,* the account of this case is interrupted; it is resumed at *344.*

[40] Manuscript reads "neat," which spelling occurs interchangeably with "net" throughout the account of this case. The editor has uniformly adopted the modern spelling, "net."

themselves have construed this Agreement to entitle complainant on the net proceeds only. Contemporaneous constructions decide the meaning of statutes. In their various settlements of parties, these words, "proceeds of sale," have been repeatedly settled. 3 Camp.N.P. 385, held that what the parties said before and at the time a written agreement was made, was admissible in evidence to prove the meaning of the word "privilege." All the entries in the books of parties show that they understood proceeds of sales as we contend, *viz* net proceeds. Mr. Duplanty's deposition to show the acts of parties on this point. McCall's deposition, commission to partner not usual. He knows that commission was to be on money received.

*Mr. Vandyke* for defendants. Powder to be deposited in different places in the country. Agents to sell; Peter Bauduy not to sell in any other manner than another partner. Agents to be paid; he was to travel, settle accounts of merchants and agents, and bring home money received. According to complainant's construction he claims commissions on sales; that is, on gross amount of sales, by which he would receive commissions on the commissions of agents, on all losses from whatever cause they may happen; and in short upon every misfortune to the company arising after and on the sales. Complainant's own acts, evidence in the cause that Mr. Bauduy should take commissions on the net proceeds only. His settlements in the books, stated by himself, show that he construed his commission to arise on net proceeds alone; and excluding losses.

Mr. Bauduy undertook to keep the accounts and understood his rights and acquiesced in our construction, and made his claim, and received his compensation on the principles we contend for. This claim of commissions came from Mr. Garesche. McCall's deposition fully explains the meaning of the parties; his answer to 8th interrogatory, and to 7th interrogatory. Mr. Dahlgren's answer to 5th interrogatory. William Read to 4th. David Lamoth to 5th, 6th, and 7th. Paul Beck to 5th, 6th, and 7th. Bousquet to same.

*Mr. Read, Sr.,* for defendants. This objection is an afterthought. The complainant was as well apprised when he received his profits and made statements, as he was when this exception was taken. It is not Mr. Bauduy's duty to make sales of powder. By article 2 of Agreement [at Wilmington, August 25], 1802 (Notes, above), Mr. Bauduy had only to give his time to specific services. Thus as he was not an agent to make sales, he is not entitled to gross proceeds, for such commission is allowable to factor only. The whole Agreement must be resort-

ed to to explain the meaning of "proceeds of sales." And that must mean to proceeds after deducting commissions of other persons. Exhibit No. 13 shows that Mr. Bauduy, subsequent to sale of his shares, claimed only 2½ on the net proceeds.

*Mr. McLane* for complainant. This depends on principle of construction. Mr. Duponceau's opinion, means gross proceeds. Mr. Duplanty by his acts shows that it may mean gross or net proceeds. He uses the word "net" in his entries in these books, and if it means net proceeds *ex vi termini,* why does he use "net"? Mr. Biderman says it means net or gross as it is used. Proceeds of sales mean net or gross according as the expression is used. Then we must look at the Agreement to see its meaning. Mr. Duplanty says when sales were made by company he gave commissions on gross sales; when by factor, on net proceeds. This shows he construed this article on commercial usage, treating Mr. Bauduy as factor. But this agreement is to be treated according to its own objects. Mr. Bauduy risked his fortune, gave his time for six months in year, was to go into the interior to establish factors, depots, etc. Mr. Bauduy was responsible in his private capacity, not only as partner, for all the contracts of this company. As a partner he was responsible for all the debts. As indorser he was liable in a second capacity. Bauduy was bound to contribute his credit by indorsing, that he is entitled on the gross amounts. When there is loss he loses his profits; and he risks his credits. Then commissions are given as an indemnity for his trouble and care and *credit.* The 2½ per cent were the only indemnity. Philadelphia commission: Mr. Bauduy's propositions, Mr. du Pont's answer; this shows the idea that Bauduy required the 2½ on gross sales. This idea of commission on gross sales is kept up in Agreement, July 1, 1805. See New York Agreement (Notes, above), article 2; here sales, and produce of sales are used as meaning same thing. Philadelphia Agreement, article 3; his commission of 2½ on sales (Notes, above).

As to Mr. Bauduy's construction by the settlements made. There is no entry to be found where Mr. Bauduy settled his commissions on the net proceeds. Duplanty is the author of the construction claimed by defendants. There never was a final settlement; or settlement of the parties. There never was any act of settlement by which Mr. Bauduy has affirmed the construction of Duplanty and defendants. There never was a settlement. This point was never mooted. And as to the entries they were always open to investigation. But if Mr. Bauduy had mistaken his rights, this Court will allow him to correct any mistake. McCall says he knows that the parties mean 2½ on the

net proceeds. How does he know it? He does not say he knew it from Mr. Bauduy. He is incorrect. Duplanty shows that "proceeds of sales" mean either net or gross proceeds, as the sales are made by agent or company.

THE CHANCELLOR proposes to give his opinion on these exceptions, and especially on the meaning of the words "proceeds of sale" tomorrow.

The sixth, seventh, and eleventh exceptions (above), all being *in pari materia,* are taken up and considered together. Adjourned without further proceeding until tomorrow.

----

### April 14, 1819.

THE CHANCELLOR delivered the following opinion on the matter argued yesterday.

The fourth article of the Agreement of August 25, 1802 (above) provides that as an indemnity etc. (See said pages.)

The question here to be determined is whether the complainant shall be allowed commissions on the gross amount of sales, or on the net proceeds, deducting the commissions of agents and all other expenses. This is a question of law to be decided by the Articles of Agreement and not by any commercial usage. So the witnesses also generally consider it when interrogated on this special case.

It appears to me, from the words of the Agreement that the parties intended that the commissions should arise on all the powder manufactured at this factory, and sold. They were designed, as it is expressed, as an indemnity, not merely for his services, but for his credit, for the risk which he incurred, by his personal responsibility; and were to be charged on the whole amount of powder made, which should be sold. Until the sale, he could have no commission; but as soon as that was effected, the sum became ascertained. This construction is corroborated by the second article of the Agreement of July 1, 1805 (Notes, above). There it speaks of "the 2½ per cent which has been allowed him on all the sales," as if they deemed the whole amount of sales to furnish the sum on which his commission should be charged. And this is further confirmed by the last agreement by which the complainant sold out his interest in this concern (Notes, above). There, article 3, his commission of 2½ per cent on sales is referred to. Now, if he were to be al-

lowed commissions on the net proceeds alone, it is strange, that in all these contracts such generality of expression should be used. The expression, "proceeds of the sales" is certainly equivocal when taken by itself, but when taken in connection with the consideration upon which the commissions were allowed, and with the subsequent Agreement, I think the fair meaning is that 2½ per cent should be allowed on the gross sales.

The paper indorsed "P. Bauduy's Statement of Commissions. No date. 12. B.B." is not an exhibit of a claim of the complainant, and of his charges for commissions, but is a statement of powder sold, and of commissions received by P. Bauduy on particular sums to a given time. By that statement it was not intended by Mr. Bauduy to abandon his commissions on $7,978.99, these called outstanding debts: nor on $20,800 due from the War Department; and yet no commissions are charged on these sums. And the reason is, because the commission which he received, and not which he claimed, were only intended to be there stated. That paper has no bearing on the case. But at all events, if it were a mistake, it should have no influence now. I confess though that if Mr. Bauduy had, by any unequivocal act, given such an explanation of the meaning of the parties, in the construction of the words "proceeds of sales," I would now confine him to such construction, as evidence of their understanding, and of their intention, at the time the contract was made.

---

The sixth, seventh, and eleventh exceptions now under consideration ([Notes,] p. 291). These exceptions arise on second article of Agreement of July 1, 1805 (Notes, above).

*Mr. McLane.* When there was no purchase of materials, Mr. Bauduy was entitled to 5 per cent, but when he purchased and became responsible, and powder manufactured from raw materials purchased by the company, then he was entitled to 2½ [per cent] commissions. But when they worked the materials of others, his commissions were 5 per cent. When powder was furnished to the United States and materials furnished by the United States, then to the date of 1812 the company worked materials of the United States and charged for such, and not for powder sold.

October 9, 1812. Agreement between Callender Irvin, Commissary General of the United States, and Du Pont and Co. This is a contract for the purchase of materials by the company and sale of powder to the United States. By this contract the raw materials furnished was more than sufficient for quantity of pow-

der furnished. No charcoal in this contract furnished by the United States. The government was to pay for the powder 58 cents per pound, and we have not got our commissions on the whole powder made or sold. If it is powder manufactured upon raw materials of the United States, we are entitled to 5 per cent on powder at 58 cents. If powder sold, then 2½ on sale at 58 cents. Day Book No. 1, p. 49; August, 1805. Same book, p. 83; April, 1806. This charge for powder manufactured at 8 cents a pound. Same book, p. 119; charge of 8 cents for powder manufactured. P. 129, March, 1807; charge for powder re-manufactured, 8 cents per pound. P. 149, August, 1807; 8 cents for powder re-manufactured. P. 173, similar entry. Journal No. 7, July, 1812; this to show charges of manufacturing powder, for manufacturing 50,000 wt. gun powder, of their, United States' materials; 12 cents a pound, $6,256.94. These to show that charges were made for manufacturing only.

Entries under contract with Irvin, as sale of powder and purchase of materials. Journal No. 7, p. 202, June 30, 1814; charge against United States for 2,000 barrels powder at $58 per barrel, 58 cents a pound; then for 1,840 barrels, at $56 per barrel. Same book, p. 216, July 14, 1814; United States, to gun powder 34 barrels, $1,904, (56 cents per pound). P. 218, July 23, 1814; United States, to gun powder, 75 barrels, $4200, (56 cents a pound). (A barrel contains 100 lbs.) P. 219, July 26, 1814; United States, for gun powder, 60 barrels, $3360. P. 220, July 31, 1814; United States, for 75 barrels gun powder, at 56 cents. P. 230, [——];[41] entry of purchase of saltpetre of United States. P. 232, [——];[42] similar entry.

*H. M. Ridgely* for defendants. Answer of defendants, p. 5 of further answer, p. 3 of further answer. Contract, October 9, 1812, Irvin and Company. February 26, 1813, contract, Callender Irvin Commissary General of U. S. and Du Pont and Co. By these contracts one is to furnish materials, the other to deliver powder. The word "sell" is not used in these contracts. Irvin could not sell the materials of the United States. Deposition of Callender Irvin taken August, 1818. Schedule, annexed to Irvin's deposition, *B,* account between Commissary General and Du Pont and Co. This contract, 1812. Schedule *C* as to contract February 6, 1813. By a letter of Mr. Garesche No. 14, he, for Bauduy, states that Bauduy will stand to settlement made by Victor du Pont. (The company, Du Pont and Co., never paid to Irvin anything for saltpetre and sulphur, that was discounted).

---

[41] Blank in manuscript.
[42] Blank in manuscript.

THE CHANCELLOR decided these exceptions by determining that, according to the spirit of the Agreement, July 1, 1805, article 2 (Notes, above), Mr. Bauduy should be allowed commissions for work in which the purchase of materials does not enter, 5 per cent. Here the United States furnished (not sold) their own materials, viz the nitre and sulphur; the company furnished the charcoal. Perhaps this case is not exactly within the letter of the Agreement, article 2, for the United States did not wholly furnish the materials; nor did the company purchase them. The equity of the case will be to allow as for materials not purchased by the company.

Eighth exception (See Notes, above).

*Mr. Read, Jr.* By the Philadelphia Agreement Mr. Bauduy became discharged from any charge on account of said usurious interest. Mr. Bauduy quit all connection from January 1, 1810 of the profits and loss. Now they charge him with loss after 1810.

*H. M. Ridgely,* for defendants, reads answer of defendants, further answer, p. 6. Duplanty's deposition to 8th original interrogatory. Bousquet, deposition, McCall's deposition to [——] [43] interrogatory. If Bauduy was answerable previous to February, 1815, what is there in that Agreement to discharge him? (Notes, above.) The Agreement left the account open. Doubtful whether he owed, or the company owed him. This Agreement does not exonerate him from any thing he fairly owed the company. He was a partner till February, 1815, and his responsibility still continues.

Ninth exception. (See above.)

THE CHANCELLOR. This charge against the complainant must be disallowed. The members of the company are bound to each other by the several Articles of Agreement. In these Agreements the complainant is not bound to keep the books. If he has by any letter contracted to pay Mr. Duplanty, that may bind him to Duplanty, but not to the company.

Tenth exception, p. 291. This charge against the complainant is allowed. They were admitted to be chargeable against complainant.

Thirteenth exception (above), postponed.

Fourteenth exception, above. (See Agreement [at Philadelphia, February 15, 1815], Notes, above.)

This fourteenth exception must be allowed. The words, "but said payments to cease in case said manufactories, or either of

---

[43] Blank in manuscript.

them, be burned, or destroyed by the enemy," may mean burning, by explosion, or in any other manner; or they may mean burning by the enemy. They must be understood according to the context, and according to the intention of the parties at the time of making the Agreement. The letters of Mr. du Pont, this day read in evidence, satisfy me that the parties designed to provide against the destruction of the factories by the enemy only; and certainly the Agreement without those letters, and without any forced construction, may bear that meaning. When, therefore, the Agreement is explained by the letters, the conclusion is inevitable that the destruction of the factories by explosion, as happened early last year, was not in the contemplation of the parties.

If the meaning of the parties could have been had from no other source but the Agreement, I certainly should have disallowed the exception, because the Agreement by itself, will admit of the construction contended for by the defendant; and the equity of the case would possibly have been promoted by such construction. However, I cannot depart from the positive contract of the parties.

The thirteenth exception now recurs. That exception is in the following words, "For that it is attempted to blend with the said account other matters of account not properly chargeable therein, particularly E. I. du Pont's individual account, and the account of the concern with Bauduy, Garesche, and Co. of which last firm E. I. du Pont is himself a member."

*Mr. Rodney,* for defendants, argues that such accounts may be blended, or in other words that E. I. du Pont's individual accounts against P. Bauduy, and against Bauduy, Garesche and Co. may respectively be set off against this demand of P. Bauduy. A separate debt may be set off against joint debt. 5 Term 493. Debt due to defendant as a surviving partner may be set off against a demand. 6 Term 582. Peake 197.

Statutes of Set-off were made for courts of law to save parties from resorting to courts of equity. 5 Ves.Jr. 108. Equitable set-off upon mutual credit, though no mutual debts upon which a set-off could be sustained at law. [*Ibid.*] 110. Where there are mutual credits, though cannot be set off at law, may in equity. 12 Ves.Jr. 346. Set-off in bankruptcy of a separate debt from the estate against a joint debt to it, and liberty to prove the balance under the commission.

*Read, Jr.,* for complainant. Statutes of Set-off apply as well to courts of equity as courts of law. In Ves.Jr. it appears that no such distinction exists. Courts of equity allowed parties all the benefit of set-off, which courts of law now allow by the Stat-

ute. Court of Chancery bound by our own law. Our statute of set off applies to Court of Chancery as well as courts of law. 1 Del.Laws 162, Act about defalcation. This Statute more strict than English Statute. This Statute introduces the words plaintiff and defendant, which English Statute steers clear of. 6 Bac.Abr. title "Set-off." This is not a set-off of defendants in this cause, but of a private account of one of the company, on a private account against the complainant. 6 Bac.Abr. title "Set-off." Debts must be mutual and due in same right. The cases of surviving partners do not apply. The surviving partner, by the death of the other partner, is legally entitled to the whole partnership concerns, to the goods, rights and credits, and as the whole is vested in him, and therefore if a suit is brought by surviving partner, the debtor may set off a debt against such individual surviving partner. A debt to surviving partner as partner, may be joined with a debt due in his own right.

*McLane* for complainant. This is a bill for specific performance of an agreement, and not for general settlement between partners. The parties have fixed the terms upon which the settlement should be made by their agreement. This case stands upon different principles from common cases of partners. The agreement specifies the terms of settlement. The private transactions of the parties Bauduy and Du Pont are not before the court. Their accounts should be entirely adjusted before the court could decree as to them, or to any set-off. 5 Ves.Jr. 108 no application. 12 Ves.Jr. They were all parties to transaction; that case goes on mutual credit. Mont. Set-Off 24, that debt to partnership becomes debt to surviving partner, by death of the other party. See Mont.Set-Off 46, that particular provision in Statute of Anne as to bankruptcy. 1 Atk. 235, courts of equity have not gone further than courts of [law].[44]

*Read, Sr.,* for defendants.

The following is the decree made on the exceptions. It was written by the complainant's counsel, examined by the defendants, and some alterations proposed by them, which were not adopted except in one or two matters of small moment. THE CHANCELLOR made some very slight additions, and particularly:

> And now, to wit, the 31st, August and 1st, 2nd, 3rd, days of September, 1818, and the 13th, 14th, 15th, and 16th days of April, 1819, this cause and the exceptions filed therein to the account of the said defendants coming on to be heard, and the same having been argued, and THE CHANCELLOR having heard read and considered the said accounts and the

---

44 Manuscript reads "equity."

said exceptions thereto, and the proofs and allegations of the parties respectively, doth order adjudge and decree that the first (above) of the said exceptions be overruled and disallowed, and that the said complainant is not entitled to a credit for the said sum of $1,000 therein mentioned; and that the second exception (above) be disallowed, and that the sixth and seventh exceptions (above) be disallowed, and that the said complainant be credited in the said account with a commission of 5 per cent upon the price paid by the United States for the manufacture of the powder contracted to be delivered as referred to in the said sixth and seventh exceptions. And that the eighth exception (above) be disallowed, and it is ordered, adjudged and decreed that the respective debts to the said concern of the said complainant and one of the defendants, E. I. du Pont, be ascertained, and the amount of the extra, or usurious interest referred to in the said eighth exception be charged to the said accounts respectively of the said complainant, and the said E. I. du Pont, according and in proportion to the amount of their respective debts to the said concern, so ascertained as aforesaid, and that the tenth exception and eleventh, twelfth, and fifteenth exceptions (all above) be disallowed, and that the sixteenth exception (above) be disallowed, subject to the directions of this decree in relation to the third, fourth, and fifth, exceptions.

And it is further ordered, adjudged and decreed that the third, fourth, and fifth exceptions (all above) be allowed and that the said complainant be credited in the said account with his commission of 2½ per cent upon the gross amount of all the sales of the powder made in the said manufactory since the first establishment thereof up to January 1, 1815, to be ascertained from the books filed in this cause under the order of THE CHANCELLOR, and the accounts of sales, invoices, and other vouchers of the said concern, and that the ninth exception (above) be allowed, and the charge of $500 per annum placed to the account of the said complainant as having been paid to R. Duplanty be stricken out of said account, and that the thirteenth exception (above) be allowed; and that the individual account of the said defendant, E. I. du Pont, against the said complainant and also the account of the said concern of E. I. du Pont de Nemours and Co. with the concern of Bauduy, Garesche and Co. be stricken out of the said account. And that the fourteenth exception (above) be allowed; and that the complainant be credited in the said account with the an-

nuity of $1,500 referred to in the said exception up to the time of rendering the said account.

And it is ordered, adjudged and decreed by THE CHAN-CELLOR that the said account be referred to James R. Black, Esq., to audit, adjust and settle the same, to take a just and true account of the powder made and sold as aforesaid, and to ascertain the balance on the said account upon the principles contained in and in pursuance of this decree. And it is further ordered, adjudged, and decreed by THE CHAN-CELLOR that the books of the concern now deposited in court under the order of the Chancellor heretofore made, and also the said accounts be delivered to the said James R. Black, Esq., for the purpose of adjusting and settling the said account and ascertaining the balance as aforesaid; and that the said James R. Black, Esq., make report to this Court of his proceeding in the premises, according to this decree, at the next term.

And THE CHANCELLOR reserves to himself the liberty to make such further order and decree in the premises as shall be agreeable to equity and good conscience.

An appeal was prayed which was never prosecuted.[45]

------

Court of Chancery. New Castle.

August 29, 1821.

August 19, 1819. An account taken by James R. Black, Esq., pursuant to the decree, filed.

September 1, 1819. On motion of complainant's counsel it was ordered that complainants and defendants respectively have leave to except to said account on or before December 1, then next. And an order was made that defendant have leave to take out of court his books and original papers at any time after the eighth instant, and that said books and papers be filed again in this office on or before the first day of the then next term.

November 30, 1819. Defendants' exceptions filed.

December 1, 1819. Complainant's exceptions filed.

April 18, 1820. Continued by consent at the instance of complainant.

------

[45] At this point, *Ridgely's Notebook II, 354*, the account of this case is interrupted; it is resumed at *III, 450*.

This case now [August 29, 1821] comes on upon the exceptions filed.

*McLane* and *Read, Jr.,* for complainant.

*Rodney, Rogers,* and *Vandyke* for defendants.

Exceptions of Peter Bauduy, the complainant:

> *First* [*exception*]. For that the Master in Chancery has pursued no regular and legal system of calculating interest in the said accounts, but has varied the principle upon which he made his calculations of interest in different parts of the account, as is illustrated by the schedule hereto annexed, particularly by that part thereof marked No. 1, which the exceptant makes a part of this exception.

> *Second* [*exception*]. For that the said Master has given the exceptant credit for interest on his commissions from an assumed time of payment, to wit, six months after the sales, which he ought not to have done, either on the ground of the interlocutory order of the Chancellor, or any legal or equitable principle; but ought to have credited the exceptant with the said interest upon the sales from the date thereof (as is in like manner illustrated by that part of the said annexed schedule marked No. 2, which this exceptant makes a part of this exception).

---

### August 31, 1821.

*McLane* for plaintiff, Bauduy. First exception is as to mode of calculating the accounts. Difference in the result not much, $100 or $200. (Mr. Black sometimes calculated by Rowlett's Tables, sometimes in common form, and used the different modes indiscriminately as to the parties, so that [if] there are any errors they fall alike on both parties, but as the result of the calculations probably do not affect one more than the other, at least it does not appear that wrong is done. Postpone this.)[46]

*Mr. Read, Jr.,* for Bauduy. Second exception: we should have interest from the time of sales of powder, and not from the time of payment. Such was the opinion of the Chancellor, and so it has been embodied in this decree.

*Mr. Vandyke* for Du Pont. The Chancellor in the decree did not mean to ascertain the time of interest upon the sales, but only commissions on the gross amount of sales. The interest was not a question before the court. The sales could not be ascertained; that is, the day at which every pound was sold. The

---

[46] At this point, *Ridgely's Notebook III, 450,* the account of this case is interrupted; it is resumed at *459.*

Article of Agreement negatives the idea. By that, accounts were to be settled every year, and the Master has taken the end of the year to calculate the interest.

*H. M. Ridgely.* The settlement of account only entitles him to commissions. The account was to be settled at the end of the year. He only should have interest from the time the money was received. He here gets interest on money lost. The great question decided in the decree was that Mr. Bauduy should have commissions on the gross amount of sales. The matter of interest did not enter into the discussion nor consideration; and it was not intention of the Chancellor, and the decree does not establish any period at which the interest should be calculated.

*McLane* for Bauduy. We claim a commission of 2½ per cent on all the sales of powder manufactured in that concern. So the court decreed. We only ask to be credited with this commission when the sale was made; then the right attaches. The sale gives us the right to the credit. Whether collected or not, we are entitled to the credit. We are not to wait till the account of the company and agent is closed. As soon as sale takes place the credit attaches. The interest follows the credit. It is a satellite of the credit. The right to interest springs up with the sales, when his credit arises. Bauduy is charged with powder on all powder sold to him, and with interest from the time of sale. Bauduy is charged with interest on money paid to him from time of payment, and he ought to have his interest on his commissions from the time the credit takes place. He is not obliged to wait till the money is collected. Postponed till other exceptions as to interest are considered.

> *Third exception.* For that on sales made to the exceptant, he is allowed no credit as is allowed on sales to other persons, but the charge is entered as of a cash sale, and this exceptant is charged with interest thereon from the date; as is in like manner illustrated by that part of the said annexed schedule marked No. 3, which the exceptant makes a part of this exception.

> *Fourth exception.* For that the said Master, under date of June, 1805 (credit side, p. 2), has credited the exceptant with the sum of $886.82 with interest from that date, which said sum is made up of various different items of credit at different dates, which if credited at the proper dates thereof would have given a larger sum of interest to this exceptant, as is in like manner illustrated by that part of the said schedule marked No. 4, which the exceptant makes a part of this exception.

*Mr. McLane.  Third exception.*  Mr. Bauduy is charged with powder, and interest is calculated against him from the day. He ought to be charged as others, and interest should not be charged earlier than any other.

*Rogers* for Du Pont.  All the partners are charged for powder they took and interest from the day.  This was the mode of charging all the partners.

*Mr. Rodney.*

*Mr. Read, Jr.,* for Bauduy.

*Mr. Rodney* for Bauduy.  Blake Ch. Pr. 221.  Admission item (a fact) binds party.

*Mr. Rogers.*

(It seems to me that the second exception be disallowed, and that the interest charged to Mr. Bauduy for powder sold to him should be charged from six months after the sale, so as to put the charge of interest for and against him from six months after the charge and credit.)

*Fourth exception.*  Disallow this exception.

*Fifth exception.*  For that in the account of the Master in Chancery the company is charged in the account of profit and loss with the interest upon the share of [——] [47] Dusquesnor, amounting to $466.66 of which Peter Bauduy's 7⁄30ths is $108.85, which was never paid by him the said Dusquesnor, but if paid at all, was paid to old Mr. du Pont by whom it was paid over to the company and who has been allowed interest in his account for all money advanced including this sum and should therefore be alone chargeable with the interest now standing to the credit of the said Dusquesnor in his account with the company; as is in like manner illustrated by that part of the said schedule marked No. 5, which the exceptant makes a part of this exception.

This exception is not sustainable, therefore disallowed.

*Sixth exception.*  For that the said Master in Chancery has not given to the said Peter Bauduy credit for as large a sum of money on February 11, 1806 as he was on that day fairly entitled to as *per* accounts adjusted on the Journal *A,* No. 1, f. 71 and Ledger *A,* No. 4, f. 27, as is in like manner illustrated by that part of the said schedule marked No. 6, which the exceptant makes a part of this exception.

*Seventh exception.*  For that the said Master in Chancery has adopted the second statement of the division of profits

---

[47] Blank in manuscript.

in 1810, in which was deducted from the sum to be divided, the sum of $1320.96 being compound interest, which ought not to [be] allowed, as Peter Bauduy is not credited with compound interest in any part of his account, as is in like manner illustrated by that part of the said schedule marked No. 7, which the exceptant makes a part of this exception.

*Eighth exception.* For that the exceptant is charged with interest on a draft by him on Robert Ralston discounted by Garesche and Raviseer, as is in like manner illustrated by that part of the said schedule marked No. 8, which the exceptant makes a part of this exception.

The sixth exception comes on to be considered.

*Mr. Rodney,* for Mr. du Pont, objects to this exception, because it was not included in the account filed by Mr. du Pont and excepted to. That the only inquiry now should be how far the Master in Chancery has erred in making out his account according to decree heretofore made. That the account, so far as it was not excepted to, is conclusive on the opposite side. What was not controverted in the account filed by defendant is binding, and admitted by not being excepted to. The Master in Chancery could only state the account in conformity to the decree; and exceptions could be filed only to errors in his not stating the account according to that decree.

*McLane* for Bauduy. The account, that is, the whole transactions of Bauduy, his debits and credits, were referred to Mr. Black accordingly to the principles of the decree. All matters of calculations and charges and credits, were referred to the Master, subject to the control of the decree made. The matters settled by the decree bound the Master, but as to the accounts generally, they were all to be adjusted by the Master.

*Mr. Rodney* reads 3 Johns.Ch. 587, Johnson's Reports, they are.

This sixth exception disallowed.

*Ninth exception.* For that the exceptant is charged with interest on money advanced by Garesche and Raviseer, from dates different from those which appear by the accounts of the said Garesche and Raviseer to have been the real dates of such advances, as is in like manner illustrated by that part of the said schedule marked No. 9, which the exceptant makes part of this exception.

*Tenth exception.* For that the exceptant is charged with the rent of a house occupied by Garesche which is properly a matter of account between Bauduy, Garesche and Company,

and the defendants in this cause, as is in like manner illustrated by that part of the said schedule marked No. 10, which the exceptant makes a part of this exception.[48]

---

[48] At this point, *Ridgely's Notebook III, 462,* the account of this episode in the case breaks off abruptly, followed by several blank sheets in the notebook.